133 A.3d 703

D.G. AND S.H., PLAINTIFFS, v. K.S.,[1] DEFENDANT.

Superior Court of New Jersey
Chancery Division Family Part
Ocean County

Decided August 24, 2015.[2]

---

[1] Initials have been used to identify the parties and child to protect their anonymity.

424

---

[2] This is an abridged version of the 96-page opinion issued by the court on August 24, 2015.

426

*Sarah J. Jacobs* for plaintiffs (*Jacobs Berger, LLC,* attorneys).

*Laura S. Witherington* for defendant (*Chamlin, Rosen, Uliano & Witherington,* attorneys).

WAUTERS, J.S.C.

This case involves issues of custody, removal, and support surrounding an unusual agreement entered into between three friends to conceive and jointly raise a child in a tri-parenting arrangement. O.S.H. is a female minor child born in 2009. Plaintiff, D.G., is the biological father of O.S.H., and K.S. is the child's biological mother. Plaintiff, S.H., is D.G.'s same-sex spouse, who has bonded with and has become a psychological parent of O.S.H. Following a lengthy plenary hearing, and for the reasons that follow, the court awards joint legal and joint residential custody of O.S.H. to all three parties and denies the application of K.S. to remove and relocate the child to a different state.

## I. PROCEDURAL HISTORY

On June 10, 2014, plaintiffs, D.G. and S.H., filed a three-count verified complaint in this court seeking to establish: 1) legal and physical custody of O.S.H.; 2) parenting time; and 3) that S.H. was the child's psychological and legal parent.

On June 13, 2014, upon plaintiffs' application, the court issued an order to show cause prohibiting K.S. from leaving the country with the child, requiring her to surrender to the court the child's passport, and placing temporary residential custody of O.S.H. with plaintiffs. The return date of the order to show cause was scheduled for June 27, 2014.

Defendant, K.S., filed and served a four-count counter-claim and answer, seeking: 1) to establish a legal custodial relationship between the parties, with physical custody vested in K.S.; 2) to establish a parenting time arrangement; 3) child support and medical coverage; and 4) permission to relocate with the child to California. Plaintiffs filed an answer to the counterclaim seeking a plenary hearing on all issues.

The court adjourned the return date of the order to show cause to July 9, 2014. Two interim orders were entered by the court, with the consent of all parties, on June 20, 2014, and July 30, 2014,

without prejudice, under which plaintiff D.G. and defendant, K.S. shared joint legal custody of the child.[3] Additionally, the court, among other things: 1) permitted K.S. and the child to embark on a vacation to California; 2) granted New Jersey continuing custody jurisdiction; 3) permitted parenting time for plaintiffs in New York, New Jersey, Pennsylvania, and Arkansas; and 4) permitted parenting time with defendant. A plenary hearing was scheduled for August 5, 2014, but, when the parties agreed to engage in mediation, it was relisted for August 20, 2014.

Following a substitution of counsel for K.S., the plenary hearing scheduled for August 20, 2014, was converted into a case management conference. The court also granted counsels' motion to retain experts to evaluate the child and the parties concerning: 1) whether S.H. was a psychological parent to the child; 2) the legal and residential custodial relationship of the parties with respect to the child, including parenting time; and 3) K.S.'s relocation application. The court re-scheduled the plenary hearing for February 17, 2015, but later granted both counsels' requests for an adjournment. The court denied defendant's request to relocate with the child to California in the interim.

Defendant filed a motion in limine requesting the court to establish the standard to be used in analyzing her application to remove the child from New Jersey to California. Defendant argued that the court should use the standard announced in *Baures v. Lewis*, 167 *N.J.* 91, 770 *A.*2d 214 (2001). Plaintiffs, in a cross-motion in limine, requested that the court find the appropriate standard to be the "best interests of the child" standard as set forth in *N.J.S.A.* 2A:34–53, *Baures, supra,* 167 *N.J.* at 118, 770 *A.*2d 214, and *O'Connor v. O'Connor,* 349 *N.J.Super.* 381, 793 *A.*2d 810 (App.Div.2002). Plaintiffs further requested that in the event that the court determined the standard was as set forth in *Baures,* that defendant's request for removal and relocation be dismissed

---

[3] There was no agreement as to which parent would have primary residential custody.

because she had failed to demonstrate a good faith reason for the move and that the move would not be inimical to the child's best interests. Lastly, plaintiffs requested counsel fees and costs. Following oral argument on these motions, the court reserved decision on the relocation standard to be applied until an initial custody determination was made at the plenary hearing. Further, the court reserved on plaintiffs' counsel fee request.

The plenary hearing commenced on March 31, 2015, and continued over nineteen days.

## II. UNDISPUTED FACTS

Beginning in the fall of 2006, D.G., S.H., and K.S. discussed conceiving a child together and creating a tri-parenting arrangement. The idea of all three parties having a child together, which started as playful thought, quickly became serious. The parties ultimately decided that they indeed would go forward and conceive and raise a child together. The parties discussed their respective roles in the child's life. They believed they were setting forth an unprecedented paradigm that they coined a "tri-parenting relationship." The parties collectively decided to use D.G.'s sperm, primarily because defendant and D.G. had been long-time friends. They used defendant's egg and decided to give the child S.H.'s surname.

In order to conceive the child, the parties researched several methods and rejected the idea of artificial insemination as too costly. According to D.G., S.H. read a book that discussed an in-home conception method known as the "Baster Method." The parties purchased the requisite, recommended equipment to assist in conception and agreed to try it. Defendant bought what was referenced as the "Cadillac of Ovulation Kits," and the parties began to attempt to conceive a child utilizing D.G.'s sperm. Defendant became pregnant after a few months, but ultimately miscarried. Following the miscarriage, the parties repeated the process and defendant again became pregnant.

Two baby showers were held in anticipation of the child's birth, one in New York City at plaintiffs' Manhattan apartment and one in Point Pleasant Beach, New Jersey where defendant was residing. In preparation for the child, the parties all took baby classes, started a registry, and began preparing for the child to have "two homes," by buying doubles of baby items.

O.S.H. was born in 2009. Soon after she was born it was "all hands on deck" as the parties all described. All three parties rose to the occasion. The parties spent the majority of the summer after the child's birth in Point Pleasant Beach, all cramped in defendant's home, co-parenting the child. At the time, defendant was working at a local restaurant owned by her parents, and she went back to work shortly after the birth. D.G. was operating a business at the Jersey Shore, and S.H., who was a high school teacher in New York City on summer recess, undertook a significant portion of the parenting responsibilities. At the end of the 2009 summer, plaintiffs decided to rent a home of their own in Point Pleasant Beach.

Following the summer of 2009, the parenting time of each party fluctuated. In the summers, plaintiffs assumed a significant portion of the parenting time due to defendant's involvement in her parents' restaurant. Defendant also owned a home in Costa Rica, where she took the child every year for varying amounts of time during the winter, with consent of plaintiffs. After Superstorm Sandy in October 2012, plaintiffs lost their summer rental home due to damage from the storm; defendant also suffered damage to her home. After the storm, plaintiffs began to enjoy weekend parenting time with the child in New York City. In the beginning, the parties discussed the physical practicalities of a parenting schedule. No written agreement as to any of the parties' legal rights of the child was made. The child's early life was exactly as they had planned and the parties were able to co-parent effectively.

The parties believed that they were creating a new family paradigm, a tri-parenting relationship with the child. They were

enthusiastic about creating this new family concept. As described above, early in the process, they discussed their respective roles. D.G. was viewed as the scheduler, with organization and time-management being his strengths. S.H. was viewed as the career educator, as his strengths were religion and education. Defendant was known as the whimsical one with a good sense of humor and wanderlust, as evidenced by her home in Costa Rica. Based on the belief that their situation was unique and wanting to share their "story" with others, the parties began to solicit news media. Eventually, "Marie Claire" magazine wrote an in-depth article, which was admitted into evidence. After that article was published the parties were approached by multiple talk shows and television programs. They appeared on the "Nate Berkus Show" to discuss their concept of "tri-parenting."

The parties were able to co-parent effectively and efficiently for a large portion of the child's early life. The turning point in the relationship and the beginning of the turmoil and acrimony stemmed from defendant's desire to relocate with the child to California. In March of 2013, when defendant and the child returned from a trip to Costa Rica, plaintiffs learned that defendant had fallen in love with her neighbor in Costa Rica, A.A., who primarily resided in California. A.A. had shared custody of his children with his ex-wife in California, which prevented him from relocating to New Jersey. Plaintiffs heard from others that defendant was considering relocating with the child to California. In June 2013, defendant approached plaintiffs and arranged a meeting. During that meeting, she discussed her thoughts and plan about relocating to California. The meeting ended with plaintiffs requesting a written parenting-time proposal from defendant.

In December 2013, defendant finally presented a written plan to plaintiffs. After considerable discussions concerning the proposed plan, in early March 2014, plaintiffs formally communicated their objection to defendant's relocation. It was at this point that the parties' original "tri-parenting" arrangement began to deteriorate.

Plaintiffs desired a court-ordered parenting time and custody determination. Ultimately, plaintiffs filed the referenced complaint. After the complaint was filed, without plaintiffs' consent, defendant took the child on a trip to California. Because of the contents of a text message from defendant, and her trip to California, plaintiffs sought an order to show cause on June 13, 2014. As noted, the court transferred sole custody of O.S.H. to plaintiff D.G. However, prior to the return date of the order to show cause, a consent order was entered that addressed interim parenting time and gave legal custody of the child to plaintiff D.G. and defendant. However, that consent order did not address residential custody. Prior to the plenary hearing, there were a series of interim consent orders addressing various issues.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. Psychological Parentage of S.H.

■ S.H. seeks an order declaring him to be a psychological parent of O.S.H. This request is supported by D.G., the child's biological father and, on the eve of trial, defendant, K.S., the biological mother, stipulated that S.H. was, indeed, a psychological parent of the child. The court finds that the undisputed facts support such a conclusion.

In *Watkins v. Nelson*, 163 *N.J.* 235, 748 *A.*2d 558 (2000), our Supreme Court ruled that in a custody dispute between a child's biological parent and a third party, custody should be awarded to the biological parent absent a showing of parental gross misconduct, abandonment, unfitness, or "exceptional circumstances." In *V.C. v. M.J.B.*, 163 *N.J.* 200, 219, 748 *A.*2d 539, *cert. denied*, 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000), the Court held there must be a finding of "exceptional circumstances" in order to conclude that a third party has become a psychological parent of a child. The Court required the presence of four elements to support such a conclusion, where the third party has lived for a substantial period with the legal parent and the child:

"(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; the legal parent must have fostered the formation of the parental relationship between the third party and the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing toward the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature."

[*Id.* at 223, 748 *A.*2d 539 (quoting *In re Custody of H.S.H.–K.*, 193 *Wis.*2d 649, 533 *N.W.*2d 419, 421 (1995)).]

Once a third party has been determined to be a psychological parent to a child, he or she stands in parity with the legal parent. *Id.* at 227, 748 *A.*2d 539. Custody and parenting-time issues between a parent and the psychological parent are to be determined on a best-interests-of-the-child standard, giving weight to the factors set forth in *N.J.S.A.* 9:2–4.

Notwithstanding the parties' stipulation, the court finds that the four-element test set forth in *V.C.* has been met. Plaintiffs D.G. and S.H. are married. Plaintiffs and defendant mutually agreed to embark on the journey of conceiving and raising a child together. D.G. has consented to, and fostered, the parent-like relationship between S.H. and the child. Moreover, K.S. consented to S.H.'s being involved in the child's life by agreeing to the "tri-parent relationship," prior to conceiving the child and for a significant period following the birth of O.S.H. Simply put, both biological parents consented to and encouraged the parenting of O.S.H. by S.H., even providing the child with S.H.'s surname. It is undisputed that plaintiffs fostered that relationship from birth and that both were involved with raising and nurturing O.S.H. since her birth.

Additionally, plaintiffs have had significant, recurring parenting time with the child in K.S.'s household, as well as in their own. S.H. also assumed the obligations of parenthood by taking significant responsibility for the child's care, education, and development, including contributing toward the child's support, without

expectation of financial compensation. He has been integrally involved with the child's life in a parental role. The testimony and evidence disclosed that S.H. often prepared the child for school and physically took her to school and that he attended to the child's general hygiene needs, including bathing, dressing, brushing her hair and teeth, and taking her to dental visits. S.H. provided organic meals for the child. He cared for her when she felt ill. S.H. arranged to have O.S.H. baptized and raised Catholic, and had her attend Sunday School classes in Manhattan. S.H. was also significantly involved in the child's early education, completing her application for admission to preschool, taking her there in the mornings, and picking her up in the afternoons. S.H. also applied for the child's admittance to a private school in Princeton, New Jersey ("Day School"). The testimony from S.H. elicited at trial disclosed a loving and caring man who has been significantly involved in many aspects of the child's life since her birth. Moreover, S.H. has contributed financially to the child by supplying her with food, clothing, and other necessities. S.H. and D.G. have decorated and furnished a bedroom in their Manhattan condominium, filled with books and toys, for O.S.H. In addition, S.H. has paid his share of medical and educational bills and has contributed to the costs of a variety of classes and activities for the child.

Lastly, the court finds that S.H. has been in a parental role for over six years, a length of time sufficient to have established a bonded, dependent relationship with O.S.H. that is parental in nature. The child has lived with S.H., spent a significant amount of time with him, and refers to him as "Papa." Moreover, plaintiffs' expert psychologist, William Frankenstein, Ph.D., credibly concluded that S.H. has satisfied the four criteria to be a psychological parent as set forth in *V.C.*

B. Residential and Legal Custody

■ Once a court has established the existence of a psychological parent relationship, the best interests of the child must be

considered to determine what relief is warranted. *K.A.F. v. D.L.M.*, 437 *N.J.Super.* 123, 137, 96 *A.*3d 975 (App.Div.2014). *Rule* 5:8–6 requires a plenary hearing to be conducted where "custody of the children is a genuine and substantial issue." *See Mackowski v. Mackowski*, 317 *N.J.Super.* 8, 11, 721 *A.*2d 12 (App.Div.1998) (a court cannot evaluate conflicting affidavits or adopt the assertions of one party over the other without the benefit of a plenary hearing); *Wilke v. Culp*, 196 *N.J.Super.* 487, 501, 483 *A.*2d 420, (App.Div.1984), *certif. denied*, 99 *N.J.* 243, 491 *A.*2d 728 (1985) (a case should not be decided merely on the basis of conflicting affidavits, or an inadequate record). More recently, in *K.A.F. v. D.L.M.*, 437 *N.J.Super.* 123, 96 *A.*3d 975 (App.Div. 2014), the court spoke to the necessity of conducting a plenary hearing when presented with conflicting factual averments material to the issues before:

> We next turn to the question of whether the court should have granted a plenary hearing. A court, when presented with conflicting factual averments material to the issues before it, ordinarily may not resolve those issues without a plenary hearing. While we respect the family court's special expertise, a court may not make credibility determinations or resolve genuine factual issues based on conflicting affidavits. *Conforti v. Guliadis*, 245 *N.J.Super.* 561, 565–66 [586 *A.*2d 318] (App.Div.1991), *aff'd in part and modified in part on other grounds*, 128 *N.J.* 318 [608 *A.*2d 225] (1992). When the evidence discloses genuine material issues of fact, the failure to conduct a plenary hearing to resolve those issues requires us to reverse and remand for such a hearing. *See, e.g., Fusco v. Fusco*, 186 *N.J.Super.* 321, 329 [452 *A.*2d 681] (App.Div.1982); *Tancredi v. Tancredi*, 101 *N.J.Super.* 259 [262, 244 *A.*2d 139] (App.Div.1968), *superseded by statute on other grounds*, *N.J.S.A.* 2A:17–56.23a, as recognized in *Mallamo v. Mallamo*, 280 *N.J.Super.* 8, 13 [654 *A.*2d 474] (App.Div.1995).
>
> Moreover, a plenary hearing is particularly important when the submissions show there is a genuine and substantial factual dispute regarding the welfare of children. *See Hand v. Hand*, 391 *N.J.Super.* 102, 105 [917 *A.*2d 269] (App.Div. 2007); and *R.* 5:8–6 (requiring the court to "set a hearing date" if it "finds that the custody of children is a genuine and substantial issue").
>
> [*Id.* at 137–38, 96 *A.*3d 975.]

In addition to conflicting assertions concerning the custodial and parenting-time arrangement that is in the best interests of O.S.H., defendant K.S. seeks permission to remove the child from New Jersey in order to relocate with her in California. *N.J.S.A.* 9:2–2 provides:

When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.

Citing to the criteria set forth in *N.J.S.A.* 9:2–4(c), which are to be applied by a court in determining the best interests of a child in an initial custody award, our Supreme Court explained the difference between a custody determination and a removal application, as follows:

Removal is quite different. In a removal case, the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests. *Cooper [v. Cooper,* 99 *N.J.* 42, 491 *A.2d* 606 (1984)]*, and more particularly, *Holder [v. Polanski,* 111 *N.J.* 344, 544 *A.2d* 852 (1988)]*, recognize that subtlety by according special respect to the liberty interests of the custodial parent to seek happiness and fulfillment because that parent's happiness and fulfillment enure to the child's benefit in the new family unit. At the same time those cases underscore the importance of the child's relationship with the noncustodial parent and require a visitation schedule sufficient to support and nurture that relationship. *The critical path to a removal disposition therefore is not necessarily the one that satisfies one parent or even splits the difference between the parents, but the one that will not cause detriment to the child.*

[*Baures, supra,* 167 *N.J.* at 115–16, 770 *A.2d* 214 (emphasis added).]

■ In circumstances, as here, where parents truly share both legal and physical custody, an application by one parent to relocate and remove the residence of the child to an out-of-state location must be analyzed as an application for a change of custody, where the party seeking the change in the joint custodial relationship must demonstrate that the best interests of the child would be better served by residential custody being primarily vested with the relocating parent.

[*O'Connor, supra,* 349 *N.J.Super.* at 385, 793 *A.2d* 810.]

In *Barblock v. Barblock,* 383 *N.J.Super.* 114, 122, 890 *A.2d* 1005 (App.Div.2006), the court explained further:

If, conversely, the situation is a rare de facto "shared parenting" arrangement, one in which each parent essentially performs an equal caretaking role, then the

removal application must be analyzed under the stricter change-of-custody test of *O'Connor v. O'Connor,* 349 *N.J.Super.* 381, 399–400 [793 *A.*2d 810] (App.Div.2002). The *O'Connor* standard hinges solely upon an analysis of the best interests of the children, regardless of the applicant's good faith motivation to relocate. In such instances, "the party seeking the change in the custodial relationship must demonstrate that the best interests of the child[ren] would be better served by residential custody being vested primarily with the relocating parent." *Id.* at 398 [793 *A.*2d 810]; *see also Chen v. Heller,* 334 *N.J.Super.* 361, 380–82 [759 *A.*2d 873] (App.Div. 2000).

*See also McKinley v. Naters,* 419 *N.J.Super.* 205, 209, 16 *A.*3d 479 (Ch.Div.2010).

■ "Custody issues are resolved using a best interests analysis that gives weight to the factors set forth in *N.J.S.A.* 9:2–4(c)." *Hand v. Hand,* 391 *N.J.Super.* 102, 105, 917 *A.*2d 269 (App.Div. 2007). The controlling consideration is the welfare of the child. *Sobel v. Sobel,* 46 *N.J.Super.* 284, 286–87, 134 *A.*2d 598 (Ch.Div. 1957). The court must focus on the "safety, happiness, physical, mental and moral welfare" of the children. *Ibid.* (citing *Fantony v. Fantony,* 21 *N.J.* 525, 536, 122 *A.*2d 593 (1956)). The "best interests" of the child means, among other things: (1) the right of children to be supported, nurtured, and educated in accord with the parents' collective income; and (2) requiring the parents to keep their promises and commitments consistent with their ability to do so. *Hoefers v. Jones,* 288 *N.J.Super.* 590, 604, 672 *A.*2d 1299 (Ch.Div.1994), (citing *Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 602 *A.*2d 741 (App.Div.1992)), *aff'd,* 288 *N.J.Super.* 478, 672 *A.*2d 1177 (App.Div.1996).

*N.J.S.A.* 9:2–4 provides:

The Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.

In any proceeding involving the custody of a minor child, the rights of both parents shall be equal and the court shall enter an order which may include: a. Joint custody of a minor child to both parents, which is comprised of legal custody or physical custody which shall include: (1) provisions for residential arrangements so that a child shall reside either solely with one parent or alternatively with each parent in accordance with the needs of the parents and the

child; and (2) provisions for consultation between the parents in making major decisions regarding the child's health, education and general welfare;

b. Sole custody to one parent with appropriate parenting time for the noncustodial parent; or

c. Any other custody arrangement as the court may determine to be in the best interests of the child.

In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

The court, for good cause and upon its own motion, may appoint a guardian ad litem or an attorney or both to represent the minor child's interests. The court shall have the authority to award a counsel fee to the guardian ad litem and the attorney and to assess that cost between the parties to the litigation.

d. The court shall order any custody arrangement which is agreed to by both parents unless it is contrary to the best interests of the child.

e. In any case in which the parents cannot agree to a custody arrangement, the court may require each parent to submit a custody plan which the court shall consider in awarding custody.

f. The court shall specifically place on the record the factors which justify any custody arrangement not agreed to by both parents.

■ Here, there was never a written agreement or prior court order regarding custody. Accordingly, the court must determine the custodial relationship that serves the best interest of the child.

The parties presented the testimony and reports of two experts during the plenary hearing. Defendant's expert was psychologist Mathias R. Hagovsky. Hagovsky interviewed the three parents multiple times at his office, individually, and with the child, and plaintiffs together with the child. Additionally, he observed the parents' interactions with the child in their residences. He also reviewed psychological test data of S.H.

The court acknowledges Hagovsky's professionalism, thoroughness, and sincere interests of the child and of the parents over-

coming their "unforgiveables," and succeeding in co-parenting. Hagovsky, in his report and in his testimony, provided findings, conclusions, and recommendations.

Frankenstein, a psychologist, was plaintiff's expert. Frankenstein evaluated the parties individually, through multiple interviews and multiple psychometric testing including the MMPI–2, which focuses on personality and behavior. He also conducted home interviews and observations of plaintiffs and the child at their New York City apartment and of defendant and the child at her Point Pleasant Beach apartment. The child was individually interviewed at his office two additional times. He also reviewed documentary materials provided by the parties. Frankenstein telephonically interviewed relevant family and friends of both plaintiffs and defendant including P.P., the child's godmother; A.S., a friend of plaintiffs; and A.A., defendant's boyfriend.

Frankenstein analyzed the facts in the case, the custody factors, and the issues of relocation. He offered opinions, conclusions, and recommendations both in his report and in his testimony at the hearing. The court acknowledges Frankenstein's professionalism, objectivity, thoroughness, and sincere concern for the best interests of the child and reconciliation of the parties.

In his "Integrative Summary of the Database and Findings, Conclusions and Recommendations," as well as in his testimony, Frankenstein provided the following observation, which the court finds credible:

> The overwhelmingly clear sense of the history suggests that K.S., D.G. and S.H. conceptualized themselves as equal parenting partners, with each fully intentional and committed, and with each of them in equal standing as parents, doing so in a planned, thoughtful, collaborative way. At least retrospectively, it is from this point where the various litigant narratives depart, somewhat on rendering of the facts and also on intentions.

The court finds the following on each of the applicable statutory elements set forth in *N.J.S.A.* 9:2–4(c) [4]:

---

[4] The court notes these factors are not numbered in the statute, and the numbers here are assigned serially as they appear in the statute. The other

442

Factor (1) The parents' ability to agree, communicate and cooperate in matters relating to the child

The evidence demonstrated that it was defendant's idea to conceive and raise a child with plaintiffs, as "they would be the best fathers in the world." Moreover, defendant stipulated to plaintiff S.H. being the psychological father to the child, a conclusion supported by the evidence. For the first four years following O.S.H.'s birth, the parties had a successful tri-parenting relationship and were able to effectively communicate, agree, and cooperate in matters relating to the child. The parties all approved of and took part in an article that appeared in "Marie Claire" magazine, which discussed the "tri-parenting" relationship as the parties had formulated it and highlighted their unique ability to agree and cooperate in matters regarding the child.

This "tri-parenting" arrangement functioned successfully until March 2013, when defendant informed plaintiffs of her intent to marry A.A. and to relocate with the child to A.A.'s home in California. Subsequently, communication by defendant became hostile and denigrating toward S.H.'s status, and communication by plaintiffs with her became strained and cautious. After six months of discussions in an attempt to reach an agreement, plaintiffs informed defendant that they did not consent to her relocating with the child. Subsequently, the ability of the parties to agree, communicate, and cooperate deteriorated. Since litigation commenced, it has essentially ceased.

Defendant testified that prior to litigation, plaintiffs, who resided in New York City at the time, were welcome to visit the child during her parenting time in New Jersey. Defendant testified she felt threatened and scared after plaintiffs filed the action to bar removal of the child. The court recognizes that some hostility and

factors, the history of domestic violence (factor 4), the safety of the child and parents from physical abuse by the other parent (factor 5), and the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision (factor 6) are omitted as they are not applicable to this case.

reservations would result from plaintiffs' not agreeing to defendant's relocating with the child to California and filing of the order to show cause application. However, despite any hostility or reservation, the court finds defendant was still obligated to communicate effectively with plaintiffs for the best interest of the child. On the other hand, in general, plaintiffs have demonstrated a continued willingness to communicate and cooperate with defendant regarding the needs, well-being, and care of the child, are committed to not disparaging defendant to the child, and have an absolute commitment to respect defendant's parental rights and parenting time.

The court finds, based on the testimony and documentary evidence, plaintiffs are more likely than defendant to communicate, seek discussion, and foster agreement between all three parents on issues regarding the child.

Factor (2) The parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse

Hagovsky testified that all three parties want to assume custody of the child and all have the capacity and willingness to do so. He further noted that plaintiffs and defendant attributed any interference with access to the child to the fault of the other. The court, however, does not find substantive facts to support Hagovsky's notion that plaintiffs interfered with defendant's parenting time. However, the court finds that defendant has interfered with plaintiffs' parenting time on several occasions.

Frankenstein likewise testified that the three parents are willing to assume primary custody of the child but plaintiffs are more supportive of the child's relationship with defendant than she is of the child's relationship with plaintiffs.

The court concludes both parties are willing to accept custody of the child. However, based on testimony of the parties and documentary evidence presented, the court finds instances of defendant's unwillingness to allow parenting time of plaintiffs with

the child in the following ways: by unilaterally changing visitation times, by unilaterally threatening to limit parenting time and its location to Point Pleasant Beach, by disrespectfully, and with no regard for the negative impact on the child, attempting to minimize S.H.'s status as a parent of the child, by unilaterally switching the transfer point of the child from a mid-way location and demanding plaintiffs drive the total distance to Point Pleasant Beach from Manhattan, and by eliminating S.H. from emails and text messages and only communicating with D.G. Furthermore, after Christmas 2013, while plaintiffs had a block of time with the child in New York City, defendant repeatedly interfered with this time by demanding daily phone calls and frequent visits with the child and sending cards to her daily.

The court finds plaintiffs have always respected defendant and have cooperated in sharing parenting time with her. Plaintiffs have consented to defendant's spending lengthy winter vacations in Costa Rica for four years. Plaintiffs relocated to rentals in order to spend summers and have their parenting time close to defendant's home in Point Pleasant Beach. Plaintiff D.G.'s parents have done the same. After Superstorm Sandy destroyed their rental properties in Point Pleasant Beach at the end of October 2012, plaintiffs sought to have their parenting time in their residence in New York City, but were met with resistance and obstruction by defendant.

Although the court finds that all three parties are willing to accept custody of the child, the court concludes that defendant is more likely to be unwilling to allow plaintiffs parenting time with the child.

Factor (3) The interaction and relationship of the child with its parents and siblings

Hagovsky testified that the child is very positively bonded with all three of her parents, but to a greater level with defendant, with whom she has spent more time. Frankenstein found that the child interacts nicely with all three parents, manifesting respect, friendliness, spontaneity, and closeness toward them. The court

finds from the evidence and testimony that the child has a loving and positive relationship with all three parties.

Factor (7) The needs of the child

In general, the child's basic needs are met by all three parents; each is loving, attentive, and devoted to her. Each parent has particular strengths: D.G., is the entrepreneur, businessman, "stylist, food expert, scheduler and organizer;" S.H. strengths are "education and religion 'guru'"; and K.S. is "the outdoors and whimsical one," as she would often say. Together, they provide well-rounded parenting for O.S.H., who is bonded to each of them.

In regards to the financial needs of the child, D.G. credibly testified there was never any formal arrangement for child support and agreed that no formal child support was paid until September 2014, but that plaintiffs did pay for other items such as diapers, formula, food, and clothing. Defendant testified she never sought child support because she expected plaintiffs to contribute as they saw fit, and she did not want to get the courts involved. The informal agreement between the parties was to split all school costs and doctor bills three ways. Defendant never provided plaintiffs with the necessary health insurance information. She testified that it was reasonable for plaintiffs to want the health insurance information but, at the time, she believed it was a hassle to provide them with the documentation. Further, defendant agreed that there was an understanding there should be no formal child support. On cross-examination, defendant stated when plaintiffs were living in the house in Point Pleasant Beach, they mostly bought items like food and had a "fully stocked house" for the child.

Hagovsky found that the child's needs were met by all three parents. Frankenstein stated the child's greatest need is addressing her educational difficulties, which should be evaluated and provided for by academics, consensual co-parenting, and if necessary, a specialist. Frankenstein added that, "the child's conception narrative and tri-parenting situation necessitate common ground to support her confidence, self-esteem, and self-image in

life and during her developmental young years to safeguard from peer cruelty." In his report, Frankenstein stated that "[g]iven O.S.H.'s attachments to K.S., D.G. and S.H., and the extended networks, lengthy separations from any of her parents at this age and period of her development will complicate the nature of that attachment."

Based on the testimony and documentary evidence the court finds that all three parties have met the child's needs to date.

Factor (8) *The stability of the home environment offered*

Hagovsky found no concerns regarding the safety, general welfare, and well-being of the child in the parties' respective homes. Frankenstein, in his report opined that "[t]he stability of the home environment offered is a strong positive factor favoring" plaintiffs in that:

> The fabric of D.G. and S.H.'s life is set and stable socially, occupationally, (excepting this), in family life, and relationally. Their life satisfaction appears otherwise positive and their marriage is satisfying, reciprocal and stable, and the household is characterized by a healthy balance between structure and spontaneity. Their social capital in the form of family and friend networks is extensive, stable and longstanding. They have secured an optimal educational plan for O.S.H. should they be residential custodians.

Frankenstein further stated that "[t]he fabric of K.S.'s life is upset and unstable as she is unhappily constrained to this area. The move to California by definition undermines stability, at least temporarily." He further stated in his report and testified that this strong positive factor for plaintiffs is "perhaps the most persuasive difference between O.S.H.'s homes at this time." Based on the evidence and testimony, the court strongly concurs with his analysis and conclusion on this factor of the stability of the home environment.

Unlike Hagovsky, this court has concerns regarding the stability of defendant's home environment. Defendant lives in a small, two-apartment residence, sharing a bed with her daughter in Point Pleasant Beach. She rents one of the apartments yearly. In the summer, she rented her apartment as well, and relocated to a friend's house. For various times during four years, she relocat-

ed with the child to a small house in a remote area of Costa Rica, with poor communication service. Hagovsky wrote in his report that defendant "described her Costa Rica location as 'off the grid,' namely, a small community of 'whacky' people from the same cloth, who all get along and support each other. She identifies the life style as idyllic and wonderful for the child, though she also reports that a very good friend was murdered there in the recent past."

Defendant desires to relocate, with the child, to California. First, she intended to marry, live with, and be supported by her fiancé whom she met in Costa Rica. She has since changed her mind, and now intends to rent a small house in Ocean Beach, California and reside there only with the child during a "transition" period. She is no longer engaged to A.A., who is now her boyfriend, and she must first obtain a divorce from D.J.P., from whom she separated ten years ago. Defendant is currently unemployed, and during the transition period in California, she intends to work part-time and pursue a teaching degree.

On the other hand, plaintiffs have been married for four years and reside together. D.G. recently sold his Manhattan condominium for $1.65 million dollars and purchased a four-bedroom house in Princeton, New Jersey. D.G. will be commuting by train to his bakery business in Manhattan a few days a week and can be flexible with those days in order to stay home to care for O.S.H. S.H. has switched teaching positions from Manhattan to Day School, which the child will attend. Thus, S.H. will be at the same school location as O.S.H. and be available for the child's needs and care. His teaching position provides a predictable school year schedule.

S.H. is Catholic and the child was baptized Catholic. The child attended religious education in New York City. S.H.'s parents live in Arizona, as do his brothers and family. The child has visited them in Arizona and they have visited her in New York City.

D.G.'s parents live in their own New York City apartment, and have rented a summer house in Point Pleasant Beach. The child

and plaintiffs have spent time with them in both locations. During those times, D.G.'s parents pick up the child from pre-school, have overnights with her, and celebrate holidays, including the Jewish holidays, with her and plaintiffs. D.G.'s brother, wife, and their child, M., live near Philadelphia and have visited them in New York City. The child is very close with her cousin M., age ten, and has had sleepovers with her. Plaintiffs also have a social network of friends in the New York metropolitan area.

Defendant's parents reside in Point Pleasant Beach, and the child is also close with them. Defendant's brother and his wife, and her cousins, who live in the area, also visit defendant and the child. The child also enjoys these cousins, aunt, and uncle. According to defendant, however, she is estranged from her brother.

Based on the testimony, documentary evidence, and the above findings, the court concludes that plaintiffs are able to provide the child with a more stable home environment.

Factor (9) The quality and continuity of the child's education

To date, the child's day care and kindergarten have been shared supportively by all three parents. Defendant's day care in Point Pleasant ("Jersey Day Care"), has provided a freely structured, more play time day care environment. Plaintiffs' day care in New York City ("New York Day Care"), has provided a more structured, creative, and educational environment. D.G. credibly testified that at the time the parties were initially discussing the child's early education, plaintiffs emphasized "schooling," while defendant emphasized day care and childcare. The parties discussed the options for the child's early schooling, and defendant originally wanted to place the child in two different schools. Plaintiffs disagreed, instead wanting consistency and stability for the child, and eventually, after seeking advice from a friend who was a teacher, defendant agreed. Plaintiffs had concerns that defendant would remove the child from Jersey Day Care during the educational component, which they believed was less of a priority for defendant. Although defendant had found New York City Day

Care, she objected to the long hours the child attended the school when the she was with plaintiffs. However, plaintiffs were clearly committed to the child's being exposed to early education as much as possible. Moreover, when defendant was in Costa Rica, she attempted to provide some pre-school education for the child through the Costa Rican public schools and with a tutor who did not have formal educational qualifications.

The three parents agreed upon an elementary school in Point Pleasant Beach ("Elementary School") for kindergarten after considering a top-rated public school in New York City. Recently, the school officials met with and informed the parents regarding learning problems and the need for O.S.H. to repeat kindergarten. Defendant obtained an after-school tutor for her without consulting plaintiffs. Defendant testified the tutor has helped the child, and she is reticent for the child to repeat kindergarten which, according to S.H., is causing the child to have stress and anxiety. S.H. testified that he attempts to alleviate the child's stress and anxiety by discussing it with and consoling her.

Plaintiffs are distressed and saddened over the child's having learning issues and having to repeat kindergarten. However, they believe it will benefit her, and they support the school educators' recommendation. They attach no negative implications to it.

S.H. is fully committed to her educational progress. He has applied for her to attend Day School, as he is a faculty member who qualifies for a sixty percent tuition remission and financial assistance, lowering the cost to $12,000 per year or lower. According to plaintiffs, Day School is rated number two among New Jersey private schools. Defendant believes that the San Diego Elementary School, which the child would attend in California, is a good public school.

As previously discussed, the child has the opportunity to attend Day School, rated the second-best private school in New Jersey, with her father as a faculty member, discounted tuition, and financial aid available. There, S.H. and the child would have approximately the same school-year schedule. Day School also

offers after school child-care programs that are free and include tutoring services. Furthermore, Day School has a learning resource center and an academic support program that the child could benefit from if it is determined that she has a cognitive learning issue. S.H. testified that the benefit of private school is the school can set its own benchmarks and missions, and the school caters to teaching each individual child and attending to the individual child's needs. Day School will also evaluate the child and provide private tutoring and specialists, if necessary. This private school is highly capable of offering the best private specialists to meet the child's learning needs.

Hagovsky found that the quality and continuity of the child's education to date has been successful and shared supportively by all three parents. Because the child is a kindergartener, Frankenstein did not believe education an appropriate factor to be considered unless it is determined that the child has special needs, and then, differences in the districts' availability of special education programs and staff might be relevant.

The court finds that the Day School option is far superior to the Elementary School and would offer the child an excellent educational opportunity. The court further finds that plaintiffs, based on the testimony and documentary evidence, will assure the quality and continuity of the child's education.

Factor (10) The fitness of the parents

Hagovsky found all three parents fit. Frankenstein found no custody-specific fitness factors present. He also found that each parent had situational stress features.

The evidence supports the conclusion that all three parents are fit. They all greatly love and care for the child. The court has concerns, however, regarding the financial stability of defendant. Plaintiffs are employed, with D.G. owning a business with two partners, and S.H. being an educator at a top private school. Furthermore, D.G. recently sold a Manhattan condominium for $1.65 million dollars and recently published a book, receiving a

$40,000 advance. Defendant recently sold her house in Costa Rica for $207,000, and testified she owns her Point Pleasant Beach two-apartment house, of which she rents out one apartment all year and her own apartment in the summer. She testified she could support herself and the child in California while attending college, seeking a Master's Degree, and working part-time for a friend because she has $200,000 in savings. Defendant does not have full-time employment and only an alleged promise of part-time employment in California.

The court finds that if the child resides with plaintiffs, she would have one father with flexible working days and one father with a regular teacher's schedule at the same school system as the child. Both are available to meet the needs of the child. If the child resides with defendant, O.S.H. may have an unemployed mother in New Jersey or a mother attending college and working part-time in California, who would not be as flexible and available in meeting her needs.

Factor (11) The geographical proximity of the parents' homes

Plaintiffs recently moved to Princeton, New Jersey where S.H. will teach high school at Day School. Plaintiffs testified credibly that the distance from Princeton to Point Pleasant Beach is about a forty-five-minute drive and is forty-two miles, according to MapQuest. Plaintiffs have explained that this is a much easier commute than their former commute of New York City to Point Pleasant Beach, which was approximately one-and-a-half to two hours depending on traffic, and, according to MapQuest, sixty-six miles. Plaintiffs testified the move was prompted, in part, to be closer to defendant in Point Pleasant Beach. Further, D.G. testified that the availability of the train from Princeton to New York City makes it optimal for him to commute to his bakery business in the City.

Frankenstein recommended a series of custodial arrangements. The only one that contained a 50/50 shared-custodial arrangement was the "hybrid model." In that recommendation, Frankenstein stated it would only work if the parties moved closer to each other

than New York City and Point Pleasant Beach. D.G. believes that moving to Princeton satisfied this requirement and testified that plaintiffs took Frankenstein's words very seriously as to the issue of distance between the parties and how circumstances would change once the child gets older.

When informed at trial of plaintiffs' move, Hagovsky assumed the travel time was only fifteen minutes less and would still "be in need of the same ongoing adjustments of the activity of the child and parenting time schedule of the parents' availability."

Frankenstein opined that the geographical proximity of the parents' home at the time of his report (which was completed before plaintiffs relocated to Princeton), and at the time of his testimony (when he was aware of plaintiffs' relocation to Princeton), "is a mild negative factor" as the current geography is not supportive of a shared long-term arrangement. If nothing changes, he opined that the current parenting plan would become obsolete by the time the child is about age ten. He also stated that relocation to California is a strong negative factor that most likely will have attachment-adverse implications for the child with the non-residential parents.

Defendant testified that, with respect to the distance between California and New Jersey that it was easier on the child to fly between California and New Jersey than to drive between Manhattan and Point Pleasant Beach because the child "gets bored" in the car. The court rejects this statement as without a basis in reality.

The court finds, based on the testimony and evidence, including MapQuest distance and time, that a commute between Point Pleasant Beach and Princeton is easier due to less distance, time, and traffic issues than a commute between Point Pleasant Beach and New York City. The court also agrees with Hagovsky that "ongoing adjustments will need to be made for O.S.H. by the parents based upon the activities of the child and the parenting time schedule of the parents' availability."

Factor (12) The extent and quality of the time spent with the child prior to or subsequent to the separation

Plaintiffs agree that the child has spent approximately seventy percent of the time with defendant and thirty percent of the time with them; defendant contends the child spent only approximately twenty percent of the time with plaintiffs. Notwithstanding, all three parents have spent quality time with the child since her birth to the present. Up to now, all three agree that defendant has enjoyed the majority of the parenting time. The court finds that prior to the implosion of the "tri-parenting," the parenting time was approximately seventy percent with defendant and thirty percent with plaintiffs. Based on the testimony and documentary evidence, defendant has been the de facto primary residential custodian of the child and plaintiffs have been the alternate residential custodial parents. However, this is only one factor to consider in the best interests analysis.

Factor (13) The parents' employment responsibilities

This has been discussed herein; plaintiffs are employed, defendant is not. D.G.'s employment responsibilities are flexible, in that he can work at home and commute several days to New York City, as he chooses, making him available to stay home and care for the child when necessary. S.H. will teach high school at Day School and will have a typical school schedule with holidays, and spring, winter, and summer recesses, mirroring that of the child.

Defendant previously worked the summer season as a hostess and waitress at her parents' restaurant. However, her parents recently sold the restaurant, and she is now unemployed. She first testified that if she relocated to San Diego, she would live with A.A. and remain unemployed. As such, she would be available to care for the child at home. Later, she testified that she would work part-time for a friend's business in San Diego while she attends college to obtain a degree in teaching.

Hagovsky found the parents' employment responsibilities as "not applicable"; however, the court disagrees with this assess-

ment. Frankenstein found that D.G.'s work requires him to leave the house at early hours, but that he can negotiate needed time at home, as circumstances demand. He also stated that S.H.'s work demands are predictable during the school year with some higher demand of school events on the school calendar. He opined that defendant's work demands are uncertain, although her restaurant management and server skills are transferable to many opportunities.

The court finds plaintiffs' employment responsibilities are predictable, consistent, and stable, and would permit them to provide for the child's needs, care, and well-being. The court also finds that defendant has uncertain plans for employment and for pursuing a teaching degree, and that defendant will have less availability and flexibility to provide for the child's care, needs, and well-being.

Each of the parents testified multiple days during the plenary hearing. The court finds both plaintiffs' testimony highly credible, based upon their demeanor, consistency, recollection of the facts and their sincere interest in what is in the best interests of the child, including maintaining and respecting equal parenting with defendant. On the contrary, the court finds defendant's testimony not credible and disingenuous based upon her demeanor, hesitation, and avoidance of cross-examination questions, lack of recollection of the facts, distortion of her intentions as evidenced in the multitude of email exhibits presented into evidence, inconsistent documentation and testimony regarding relocating to marry and reside with A.A., her fiancé (now boyfriend), contradictions in her direct and cross-examination testimonies, and denial of her ill-intentions of negating plaintiffs' duties and full-parenting roles in the child's life.

The court generally accepts Frankenstein's analyses and conclusions of the custody factors set forth in *N.J.S.A.* 9:2–4(c). However, the court found some critical distinctions in Hagovsky's analyses and conclusions concerning those statutory factors, as discussed *infra.* The court weighs heavily its findings regarding

factor 1, "the parent's ability to agree, communicate and cooper-
ate in matters relating to the child;" factor 2, "the parents'
willingness to accept custody and any history of unwillingness to
allow parenting time not based on substantiated abuse;" factor 8,
"the stability of the home environment offered;" factor 9, "the
quality and continuity of the child's education;" factor 10, the
"fitness of the parents;" factor 11, "the geographical proximity of
the parents' homes;" factor 12, "the extent and quality of the time
spent with the child prior to, in this case, the dissolution of
successful "tri-parenting;" and factor 13, "the parents' employ-
ment responsibilities."

The court's analysis of these custody factors militates in favor of
plaintiffs and defendant having equal legal and residential custody
of O.S.H. The court thereby orders joint legal custody to all three
parents with the plaintiff's having fifty percent residential custody
and defendant having fifty percent residential custody. The court
further orders that the child attend Day School and reside with
plaintiffs in Princeton during the school week. The court further
orders that the parties follow the parenting time schedule ordered
by the court in this opinion.

Our Supreme Court has addressed joint residential relation-
ships, stating that when "joint custody is likely to foster the best
interests of the child in the proper case," it is a suitable alternative
to sole custody in family law actions. *Beck v. Beck*, 86 *N.J.* 480,
488, 432 *A.*2d 63 (1981). More specifically, the Court stated that
the following factors should be considered when considering joint
residential custody: 1) whether the children have established such
relationships with both parents that they would benefit from joint
custody; 2) whether both parents are physically and psychologi-
cally capable of fulfilling the role of the parents and willing to
accept custody; 3) the practical considerations, such as the finan-
cial status of the parents, their geographical proximity, the de-
mands of their employment and the age and number of children
would permit joint custody; 4) whether the parents are able to
isolate their personal conflicts from their roles as parents and

children be spared whatever resentments and rancor the parents may harbor; and 5) the preference of the children if they are of sufficient age and capacity. *Id.* at 497–501, 432 *A.*2d 63.

The court is satisfied that the application of the facts to these factors justifies a joint legal and joint physical custodial relationship between the parties with respect to O.S.H. Plaintiffs, who understand the importance of maintaining and encouraging the bond that the child has with her mother, will continue to foster and promote that relationship as they have done in the past. Plaintiffs' actions and representations are conducive to a joint residential relationship. Moreover, during the early portion of the child's life, the parties effectively engaged in co-parenting in accordance with their "tri-parenting" arrangement. Both experts have expressed the potential for reconciliation between the parties and their ability to return to the effective co-parenting relationship they once had. Expert help or co-parenting therapy may be able to resolve the issues between them so that all parties may effectively co-parent. The court acknowledges that there will be a period of adjustment for all concerned.

Ultimately, the court concludes that the child's having to endure frequent travel time between Princeton and Point Pleasant Beach due to a joint residential custodial plan is heavily outweighed by the loving bond and relationship the child will be able to maintain and experience in both households in New Jersey. In order for the arrangement to succeed, the court orders the three parents to successfully complete a co-parenting course and to reconcile their discord for the well-being of the child.

C. Relocation and Removal Application by Defendant

As noted, defendant seeks permission to relocate with the child to California. It is clear according to *Baures, supra,* 167 *N.J.* at 118, 770 *A.*2d 214, that the party seeking to move must show: 1) there is a good faith reason for the move; and 2) that the move will not be inimical to the child's interests. Thus, guided by

these principles, the Court announced the factors to consider when assessing whether to order removal.

> [I]n assessing whether to order removal, the court should look to the following factors relevant to the plaintiff's burden of proving good faith and that the move will not be inimical to the child's interest: (1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

> [*Id.* at 116–117, 770 *A.*2d 214.]

The Court noted that it developed this "hybrid scheme" for removal to "accord [ ] particular respect to the custodial parent's right to seek happiness and fulfillment." *Id.* at 97 [770 *A.*2d 214]. This hybrid scheme announced in *Baures,* was further discussed in *O'Connor:* [I]n determining the standard to be applied to a parent's removal application, the focus of the inquiry is whether the physical custodial relationship among the parents is one in which one parent is the "primary caretaker" and the other parent is the "secondary caretaker." If so, the removal application must be analyzed in accordance with the criteria outlined in *Baures, supra,* 167 *N.J.* at 116–17 [770 *A.*2d 214]

> [*O'Connor, supra,* 349 *N.J.Super.* at 385, 793 *A.*2d 810.]

The *O'Connor* court further clarified when the scheme in *Baures* would be inapplicable, stating:

> If, however, *the parents truly share both legal and physical custody,* an application by one parent to relocate and remove the residence of the child to an out-of-state location must be analyzed as an application for a change of custody, where *the party seeking the change in the joint custodial relationship must demonstrate that the best interests of the child would be better served by residential custody being primarily vested with the relocating parent.*

> In determining whether the parties truly share joint physical custody, although the division of the child's time with each parent is a critical factor, the time each parent spends with the child must be analyzed in the context of each parent's responsibility for the custodial functions and duties normally reposed in a primary caretaker.

[*Ibid.* (emphasis added).]

Here, the court has awarded the parties joint legal and equal residential custody of the child. Thus, the *O'Connor* standard for relocation applies, namely, that the party seeking relocation must demonstrate that the best interests of the child would be better served by residential custody's being primarily vested with the relocating parent. Defendant, therefore, has the burden of proof. This court has concluded that the best interests of the child mandate a joint residential relationship between the parties. Therefore, the court must now consider the facts underpinning that conclusion, in the context of defendant's application to relocate with the child and, thus, changing that joint custodial relationship.

Defendant's reasons for the move are at best tentative and speculative, including a major change in her living situation with A.A., her employment and educational plans, her availability to care for the child and her lack of family support to help with the child's care, her house rental plan, and her friends and new family contacts. Defendant would uproot the child from her long and stable living arrangement with plaintiffs and defendant. As the child told Frankenstein, she believes she lives with her fathers and her mother. Further, defendant would uproot the child from her family and social network in the surrounding area. Moreover, the distance between California and New Jersey would diminish the child's ability to maintain her significant bond with plaintiffs, who would be excluded from her daily life activities and denied frequent parenting time.

Defendant's past behavior is predictive of her future behavior of unilateral decision-making for the child and of her not maintaining the child's significant bonded relationship with plaintiffs. Plaintiffs' past behavior is predictive of their future behavior of cooperating and collaborating with defendant on issues of raising the child, and of their commitment to maintaining the child's significant bonded relationship with her mother.

Based on the "best interests of the child" standard discussed in *O'Connor*, the court denies defendant's application to relocate with the child to California. Notwithstanding this analysis, the court finds that even under the less stringent *Baures* relocation standard, defendant's request to relocate must be denied.

In addition to denying relocation, the court orders that the child's passport remain in the possession of plaintiffs, and that defendant shall not leave the country or the state with the child without the consent of plaintiffs.

### D. Parenting Time

A child's best interests are fostered when both parents are involved with the child, assuring the child of frequent and continuing contact with both parties. *N.J.S.A.* 9:2–4. In promoting the child's welfare, the court should make every effort to attain for the child the affection of both parents. *In re Jackson*, 13 *N.J.Super.* 144, 147–48, 80 *A.*2d 306 (App.Div.1951) (citing *Turney v. Nooney*, 5 *N.J.Super.* 392, 397–98, 69 *A.*2d 342 (App.Div.1949)) (visitation for a non-custodial parent should not be limited unless said parent is deemed unfit). Therefore, the court must consider the public policy that children of separated parents should have the love and respect of both parents for the general welfare and happiness of the children. *Daly v. Daly*, 21 *N.J.* 599, 604–05, 123 *A.*2d 3 (1956).

In regards to the joint legal and residential custodial relationship created here, the court has established a set schedule to give both plaintiffs and defendant essentially equal parenting time with the child. The schedule will start at the beginning of the academic year and will coincide with the child's Day School schedule. Although this is a court-ordered schedule, the parties are free to mutually modify it as it pertains to pick up/drop off times or specific dates. As Hagovsky observed, this schedule needs to be flexible for the evolution of the child's activities and the parents' work schedules. However, the parties may not unilaterally change parenting time and the amount of time spent with each side should remain equal. For parenting time during holidays,

this court defers to the Court Holiday Schedule for this year, as should the parties for the years following unless specifically modified by the court. During the times when the parent or parents do not have the child, they may have one phone call, Skype, or FaceTime call per day, which should be limited to fifteen minutes. During these calls, neither party shall upset the child's peace or stability nor disparage the other party in any way.

In summary, more generally and obviously subject to the ordered schedule, during the child's academic calendar year plaintiffs will enjoy parenting time during the week; defendant will enjoy parenting time every weekend, and the majority of school breaks during the academic calendar year. During the child's summer break, defendant will enjoy the majority of the parenting time, with plaintiffs receiving designated time. The court has developed a parenting time schedule that should easily transfer to the child's future academic years. The court orders the parties to communicate and cooperate in future years to modify the above schedule to coincide with the dates of the child's future academic calendars. Again, for future years, the overnights should be as close to equal as practicably possible.

## E. Legal Parentage

The court concludes that S.H.'s claim for the establishment of legal parentage must be denied as a matter of law. This court does not have the jurisdiction to create a new recognition of legal parentage other than that which already exists-genetic contribution, adoption, or gestational primacy. Gestational primacy is irrelevant with a male. Thus, his claim would be more appropriately viewed as an adoption, since he did not genetically contribute to the child. S.H. is currently deemed the psychological parent. *N.J.S.A.* 9:17–39 defines a "parent and child relationship" as used in that act as "the legal relationship existing between a child and the child's natural or adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations. It includes the mother and child relationship and the father and child

relationship." Moreover, *N.J.S.A.* 9:2–13(f) defines "parent" as "a natural parent or parent by previous adoption" when not otherwise described by the context.

In *In re T.J.S.*, 419 *N.J.Super.* 46, 53–54, 16 *A.*3d 386 (App.Div. 2011), *aff'd*, 212 *N.J.* 334, 54 *A.*3d 263 (2012), the court ruled that legal parentage may be established in only three ways under the Parentage Act, *N.J.S.A* 9:17–39: "genetic contribution, gestational primacy, or adoption." The court also found that the Parentage Act does not violate equal protection under Article I, paragraph 1 of the New Jersey Constitution because the distinctions drawn between an infertile husband and an infertile wife are grounded in actual reproductive and biological differences, which the Legislature may consider in defining alternative means of creating parenthood. *In re T.J.S., supra,* 419 *N.J.Super.* at 67, 16 *A.*3d 386.

Here, S.H. did not contribute genetically to or act as a gestational carrier of the child, nor has he moved for adoption. Thus, he may not be found to be a legal parent.

Additionally, even though S.H.'s surname is on the child's birth certificate as the child's own, this is not dispositive of legal parentage, as S.H. bears no biological relation to the child. Moreover, simply because the child bears his last name holds no weight in the determination of legal parentage. *Id.* at 53, 16 *A.*3d 386 (holding that a child's birth certificate only records parentage as reported by others and "neither constitutes a legal finding of parentage nor independently creates or terminates parental rights"). Further, the child's birth certificate lists D.G., the biological father, as the father, and does not list S.H.

The constitutional claims of S.H. in the instant case must also fail. Although this court is particularly sympathetic to the claims of S.H. to establish legal parentage, a "tri-parenting model" with three legal parents is supported neither by the statute at hand nor the case law. A statutory change is best left to the Legislature, as such change demonstrates a "social policy choice," not a constitutional question. Such requested designations by this

court most likely would have far-reaching implications "that should be addressed, if at all, by the other branches of government, informed by a thorough and public debate of these profound and significant questions." *T.J.S., supra,* 212 *N.J.* at 343, 54 *A.*3d 263. Unfortunately, although the best interests of the child standard is used for various family law determinations involving the child's well-being, it is not a factor in defining parenthood under the Parentage Act. *D.W. v. R.W.,* 212 *N.J.* 232, 251, 52 *A.*3d 1043 (2012).

F. Child Support and Related Issues.

Both sides seek child support from the other. The court has ordered that the parties share joint legal custody and joint residential custody with equal parenting time. It is under this scope that the court has analyzed the issue of child support. This case is an extraordinary case and, as such, there are a few separate issues that will be addressed in turn. The first issue is whether S.H. should be compelled to contribute to the child support calculus given his designation of psychological parent. If so, the second issue is how the child support amount should be allocated. Lastly, the court will address the medical, educational, and extracurricular activity expenses for the child.

1. S.H.'s Psychological Parentage Designation and Child Support

There is precedent in New Jersey that compels psychological parents to pay child support. The Supreme Court stated that even though there is no statutory requirement imposing a duty of support on a stepparent for his or her spouse's children from a previous marriage, courts have held that a stepparent's duty to pay child support beyond dissolution of marriage can be enforced by applying equitable estoppel. *Miller v. Miller,* 97 *N.J.* 154, 162–63, 478 *A.*2d 351 (1984). It has also been well established that child support is a right that belongs to the child. *Martinetti v. Hickman,* 261 *N.J.Super.* 508, 512, 619 *A.*2d 599 (App.Div.1993).

 Here, the court recognizes the extraordinary manner in which the parties came before it. Reiterated throughout this entire opinion is the concept that all three parties discussed and developed this "tri-parenting" relationship for the child. S.H., who has been deemed a psychological parent to the child, was part of the initial formation of this arrangement and, as such, was committed to providing for the child's care, needs, and well-being. Additionally, S.H. testified at trial that he does not see himself in a role other than that of a parent, and that when agreeing to conceive the child, he bound himself both financially and emotionally to her upbringing and care and, as such, is willing to be included in the child support analysis. The court acknowledges and commends S.H.'s willingness to be included in the child support calculus, despite potential contrary case law. However, the facts of this case do not support the elements of equitable estoppel since the biological parents are available to pay child support for the child.

### 2. The Child Support Calculus

The court rules mandate that the court apply the child support guidelines when contemplating child support, but may modify the child support calculus where "good cause is shown." *Caplan v. Caplan*, 182 *N.J.* 250, 264, 864 *A.*2d 1108 (2005). *Rule* 5:6A states:

The guidelines set forth in Appendix IX of these Rules shall be applied when an application to establish or modify child support is considered by the court. The guidelines may be modified or disregarded by the court only where good cause is shown. Good cause shall consist of a) the considerations set forth in Appendix IX–A, or the presence of other relevant factors which may make the guidelines inapplicable or subject to modification, and b) the fact that injustice would result from the application of the guidelines. In all cases, the determination of good cause shall be within the sound discretion of the court.

A completed child support guidelines worksheet in the form prescribed in Appendix IX of the Rules of Court shall be filed with any order or judgment that includes child support that is submitted for the approval of the court. If a proposed child support award differs from the award calculated under the child support guidelines, the worksheet shall state the reason for the deviation and the amount of the award calculated under the child support guidelines.

When the parties in a particular case share joint legal custody and joint physical custody, with equal parenting time, the court must consider a shared parenting child support award. *See* Child Support Guidelines, Pressler & Verniero, *Current N.J. Court Rules*, Appendix IX–A to *R.* 5:6A at 2638–39 (2015). In terms of shared parent arrangements, the Appellate Division has stated:

In applying the shared parenting formula, however, a critical first step is a designation of each parent as either the Parent of Primary Residence (PPR) or the Parent of Alternate Residence (PAR). As the Guidelines note, "Either the PPR or the PAR may be the obligor of the support order depending on income and the time spent with the child. The designation of PPR and PAR is not related to the gender of either parent or the legal designation of custodial parent." *See* Paragraph 14b. The guidelines then set out a definition for PPR and PAR:

"(1) Parent of Primary Residence (PPR)-The parent with whom the child spends most of his or her overnight time. The primary residence is the home where the child resides for more than 50% of the overnights annually. *If the time spent with each parent is equal (50% of overnights each), the PPR is the parent with whom the child resides while attending school.* ...

(2) Parent of Alternate Residence (PAR)-This is the parent with whom the child resides when not living in the primary residence."

[*Benisch v. Benisch,* 347 *N.J.Super.* 393, 395–96, 790 *A.*2d 213 (App.Div.2002) (emphasis added).]

In *Benisch,* the court found the definitions of PPR and PAR inapplicable to the case because both parties shared an identical amount of parenting time and neither parent primarily had the child during the week for the school week. *Id.* at 396, 790 *A.*2d 213.

Further, the court in *Benisch* found that the designation of PPR and PAR has a monetary effect on the guidelines calculation. The court discussed how the guidelines in a shared parenting arrangement are allocated stating:

Paragraph 14 of the Guidelines explanation, which deals with shared parenting calculations, contains a subparagraph g entitled, "Assumptions of the Shared–Parenting Adjustment." That provision notes that the "basic child support amount" set out in the Guidelines (here $354 per week) actually consists of "three broad consumption categories ... as follows: 38% [represents] fixed expenses, 37% [represents] variable expenses, and 25% [represents] controlled expenses." The provision then notes the "assumption" that "fixed expenses" and "variable expenses" each represent payments which must be met, to a greater or lesser extent, by both the PPR and the PAR. Significantly, however, that is not true of

"controlled expenses," which represent 25% of the "basic child support amount." With respect to that item, the Guidelines say this:

"Controlled expenses are incurred by the PPR only and, thus, are apportioned between the parents based on their income shares, not in relation to time spent with the children."

[*Id.* at 397, 790 *A.*2d 213.]

The court in *Benisch* further explained how requiring the PAR to incur the "controlled costs" allocated in the guidelines would be inequitable when parties share an equal amount of parenting time stating:

The theory of that "assumption"—that "controlled costs" will be incurred by the PPR only and not by the PAR—is spelled out in subparagraph f of Paragraph 14 of the Guidelines explanation, which describes "controlled costs" as costs "over which the PPR, as the primary caretaker of the child, has direct control. This category includes clothing, personal care, entertainment and miscellaneous expenses." The assumption that "controlled expenses" are "incurred by the PPR only" is consistent with the premise of the Guidelines, that the child will spend more time with the PPR than with the PAR. On that basis, it is probably reasonable to assume that the PPR would indeed incur expenses for "clothing, personal care, entertainment and miscellaneous items," not incurred by the PAR. *However, when both parents have the child an equal amount of time, we can see no rational basis for any such assumption.*

[*Ibid.* (emphasis added).]

Lastly, the *Benisch* court concluded that

the court should not hesitate to make an appropriate adjustment to correct what otherwise would seem to be an injustice in applying the Guidelines without accounting for the unusual fact of the equal custody time between the two parents. Dividing the "controlled expenses" between the parties or designating both parents as PPR, would seem rational methods of accomplishing that end, although, if the court has some alternative which it deems more desirable, it should not feel preempted from employing such a device. Despite the agreement of the parties to use the Guidelines, the court should not feel constrained from varying the method of applying the Guidelines in order to accomplish the underlying purpose of our family law jurisprudence, the rules of procedure and the Guidelines themselves: effecting substantial justice between the parties.

[*Id.* at 400–01, 790 *A.*2d 213.]

The Chancery Division has further clarified *Benisch,* in a factually similar case, *Wunsch–Deffler v. Deffler,* 406 *N.J.Super.* 505, 968 *A.*2d 713 (Ch.Div.2009). There, the parties shared equal parenting time with the child and thus an adjustment to the obligor's child support obligation was necessary to account for the fact that both parties were responsible for paying for their son's

"controlled expenses" as defined under the guidelines. *Id.* at 506, 968 *A.*2d 713. The court developed a formula for situations such as the case at bar stating:

When the parties share an equal number of overnights with the child, the following three-step procedure should be used to adjust the paying parent's child support obligation to account for the fact that both parties are responsible for paying the child's "controlled expenses" during their parenting time. This procedure will "back out" the 25% in "assumed" controlled expenses from the paying parent's child support obligation. The first step is to multiply the Basic Child Support Amount determined in Line 9 of the Child Support Guidelines—Shared Parenting Worksheet by the payor's income share. Second, this figure should be multiplied by 25%, which represents the controlled expenses assumed by the Guidelines. Third, the product of this calculation is then subtracted from the paying parent's "Adjusted Basic CS Amount," as reflected on Line 15 of the Worksheet. The result reached is the payor's child support obligation and takes into account that *both* parties, and not just the party receiving child support, pay controlled expenses for the child during their equally shared parenting time. [*Id.* at 509, 968 *A.*2d 713.]

Moreover, the New Jersey Child Support Guidelines state when it would be appropriate to impute income to a party:

12. Imputing Income to Parents. The fairness of a child support award resulting from the application of these guidelines is dependent on the accurate determination of a parent's net income. If the court finds that either parent is, without just cause, voluntarily underemployed or unemployed, it shall impute income to that parent according to the following priorities:

a. impute income based on potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region. The court may impute income based on the parent's former income at that person's usual or former occupation or the average earnings for that occupation as reported by the New Jersey Department of Labor (NJDOL);

b. if potential earnings cannot be determined, impute income based on the parent's most recent wage or benefit record (a minimum of two calendar quarters) on file with the NJDOL (note: NJDOL records include wage and benefit income only and, thus, may differ from the parent's actual income); or

c. if a NJDOL wage or benefit record is not available, impute income based on the full-time employment (40 hours) at the New Jersey minimum wage ($8.25 per hour).

In determining whether income should be imputed to a parent and the amount of such income, the court should consider: (1) what the employment status and earning capacity of that parent would have been if the family had remained intact or would have formed, (2) the reason and intent for the voluntary underemployment or unemployment, (3) the availability of other assets that may be used to pay support, and (4) the ages of any children in the parent's household and child-care

alternatives. The determination of imputed income shall not be based on the gender or custodial position of the parent. Income of other household members, current spouses, and children shall not be used to impute income to either parent except when determining the other-dependent credit. When imputing income to a parent who is caring for young children, the parent's income share of child-care costs necessary to allow that person to work outside the home shall be deducted from the imputed income....

[Child Support Guidelines, Pressler & Verniero, *Current N.J. Court Rules,* Appendix IX–A to *R.* 5:6A at 2635 (2015).]

 Even after the *Wunsch–Deffler* formula is applied, the court may further deviate from the child support guidelines for "good cause," due to the intricacies, complexities, and extraordinary circumstances of this unique case and the "tri-parenting" relationship in which the parties conceived this child. These particular circumstances make the guidelines inapplicable and unjust as the guidelines do not fairly or accurately take into account the parties intended "tri-parenting" relationship. Throughout the trial, the parties testified to their intentions from the outset, indeed before conception, to raise this child together, financially, and emotionally. Thus, with the guidelines inapplicable, the court finds the most equitable ruling under these extraordinary circumstances is to require neither party to pay child support to the other. Each party shall be required to provide for the care, needs and, general well-being of the child during their respective parenting time.

The Family Part is a court of equity, and "equity never permits a rigid principle of law to smother the factual realities to which it is sought to be applied." *Gilligan v. Gilligan,* 428 *N.J.Super.* 69, 76, 50 *A.*3d 110 (Ch.Div.2012). Furthermore, the Court should not "feel constrained from varying the method of applying the Guidelines in order to accomplish the underlying purpose of our family law jurisprudence, the rules of procedure and the Guidelines themselves: effecting substantial justice between the parties." *Benisch, supra,* 347 *N.J.Super.* at 401, 790 *A.*2d 213.

The Court finds it inequitable to require plaintiffs to pay defendant child support since the guidelines do not support this intricate "tri-parenting model" and S.H., as a psychological parent,

cannot be compelled under New Jersey Law to contribute child support. Furthermore, the court finds it similarly inequitable for defendant to pay a small amount of child support to D.G. because plaintiffs together have a considerable income advantage over defendant and S.H. is committed to the financial and emotional needs of the child. As such, the court orders that neither party shall pay child support to the other.

Regarding medical expenses, including medical and dental insurance, educational expenses, and extracurricular expenses for the child, the court orders that S.H., D.G., and defendant each pay one-third of these costs. The parties testified that these major expenses would be equally split three ways. For example, in the "Marie Claire" article, defendant described that plaintiffs "provide financial support—it's not as structured as a big check every week, but they contribute to buying diapers, food, clothes, and other expenses for O.S.H. *Big expenses, like college we'll split three ways* " (emphasis added). During the hearing, the parties discussed that they would split educational and medical costs three ways. S.H. made voluntary representations that he was willing to be included in the legal obligations of the child's financial support. The court finds that it is equitable and so orders that the three parties equally pay medical expenses, including medical and dental insurance, educational expenses, and extracurricular expenses for the child. The party who is best able to provide medical and dental insurance for the child at a reasonable cost is ordered to provide it. Specifically, the court orders the parties to equally pay one-third of the child's tuition for the Day School.

The court further orders D.G. to use a portion of his one-time $40,000 book advance toward the child's expenses. Moreover, the court orders D.G. to use a portion of his yearly earned interest of the investment of the net proceeds from the sale of his Manhattan condominium toward the support and needs of the child. Furthermore, the court orders defendant to use a portion of her yearly earned interest of the investment of the net proceeds

from the sale of her Costa Rica residence toward the support and needs of the child.

## G. Counsel Fees

For reasons outlined in the full opinion, the court orders that the parties pay their own attorney fees and neither party is required to contribute to the other's attorney fees.