731 A.2d 558

ANDREW LEVINE, PLAINTIFF–APPELLANT, v. MARY
ELLEN LEVINE, (N/K/A YOUNGMAN)
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 23, 1998—Decided June 30, 1999.

Before Judges PETRELLA, CUFF and COLLESTER.

*Paul Lomberg* argued the cause for appellant.

*Caryl Wolfson Leightman* argued the cause for respondent.

The opinion of the court was delivered by

COLLESTER, J.A.D.

Plaintiff, Andrew Levine, appeals from a post-judgment order of the Family Part respecting the primary and secondary school education of his daughter, Danielle.

Plaintiff and defendant, Mary Ellen Levine, now known as Mary Ellen Youngman, were married on August 9, 1986 and divorced on April 21, 1995. Ms. Youngman has a child, Christina, born June 22, 1981 of a prior marriage, who lives with her and attended Madison High School as of the date of the plenary hearing. Danielle Elizabeth, born December 25, 1987, is the only child of the parties' marriage, and she is the subject of this controversy.

The final judgment of divorce incorporated a property settlement agreement which provided for joint legal and physical custody of Danielle and set forth the following weekly custody schedule:

Week 1:

Monday and Tuesday evening with mother (except as provided for after school).

Monday and Friday evening from after school to approximately 6 p.m. with father.
Friday evening until Monday morning to school with mother.
Week 2:
Monday and Tuesday evenings with mother.
Monday after school to approximately 6 p.m. with father.
Wednesday after school through Monday mornings to school with father.

It was the practice of the parent with overnight custody to deliver Danielle to her school the following morning.

Danielle has attended school in South Orange beginning with kindergarten and continuing through grade school at the Jefferson School. After grade five, a student in the South Orange/Maplewood school district is then enrolled in either the South Orange Middle School or the Maplewood Middle School depending on the location of the child's residence.

On February 26, 1996, Ms. Youngman and her daughter Christine moved from South Orange to Madison, about ten miles away, where Ms. Youngman also works. The arrangement of shared custody time and transportation to school has remained in effect, although each party has alleged in post-judgment motions that the other has violated the letter and spirit of the settlement agreement.

The agreement clearly contemplated that Ms. Youngman might move from the South Orange/Maplewood school district and that a dispute could arise as to the proper place of schooling for Danielle. The agreement provided that:

[I]n the event the Mother relocates from the South Orange/Maplewood area; the issue of the educational institution attended by the child shall be addressed in mediation or by the Court pursuant to the terms of this Agreement on a post-judgment application for changed circumstances. The parties agree that the child shall continue in the South Orange/Maplewood school system through June, 1996 at which time the parties shall re-address the issue of the child's schooling in the event of a relocation.

Despite the language in the agreement of intended cooperation between the parties regarding Danielle's well-being and education, there have been disagreements, court proceedings and continued acrimony between the parties as well as an inability to agree on Danielle's school placement after June 1996. After each party

filed post-judgment motions, they agreed to non-binding mediation on the issue. When the parties could not agree on a mediator, the Family Part judge selected Dr. Judith Brow Greif, a psychologist. The parties met with Dr. Greif for eight months but were still unable to reach an agreement as to where Danielle would attend school after fifth grade.

Ms. Youngman precipitated these proceedings by filing a motion for an order that Danielle be enrolled in a Madison school. The motion judge ordered that Danielle remain at her present school in the South Orange/Maplewood school district through June 1997, but directed a plenary hearing on her future school placement.

At the outset of the hearing, the parties both stated they wished joint custody and their shared-time arrangement to continue. Ms. Youngman called Dr. James McMahon, a psychologist, to testify as an expert on the matter of Danielle's schooling. Dr. McMahon met with the parties and Danielle, who said she was happy with her present school. He also spoke with various school officials of the South Orange and Madison middle schools. He recommended that Danielle remain in the South Orange elementary school through the fifth grade, because of her many friends and the fact that she was excelling there. While he had no opinion as to which school system she should attend after fifth grade, stating that "she could get a good education anywhere," he did say that the school system in Madison would be "more welcoming" to a bright, superior child such as Danielle.

In comparing the two middle schools, Dr. McMahon said that he was advised that each school had about the same teacher-student ratio with a total enrollment of about 900 for South Orange and 265 for Madison. When asked about an ideal situation for Danielle, he opined as follows:

Any middle school, first, this child will thrive at. The question is where can she really unfold. The ideal school would be one where her needs are met. What are her needs? She's a superior kid, so we have to have superior programs. I would think that the more superior kids around her generally in the school system who don't have baggage to bring with them in terms of lack of performance the better.

I think it tends that way. It's a strong alternative. But, the first alternative cannot be precluded. It's a good educational system.

\* \* \*

[B]ased upon the broad philosophy, as I understand it, of both places, it leans toward Madison. It leans toward Madison. It doesn't say it must be Madison.

\* \* \*

I would lean toward Madison, but I don't want to denigrate South Orange in any way, shape or form. . . . I would lean toward Madison on the idea that you just have more bright kids doing that anyway, and I've said as much. That doesn't mean-

THE COURT: That's more of a norm.

THE WITNESS: That's more of a norm or an ideal, as Mrs. Worth puts it. In— in South Orange you still have a lot of bright kids. You know, the distinction I've made is the philosophical one. . . . Broadly speaking, a bright or superior child would thrive in both systems. In Madison, since there's no catch-up work to do, the situation is one where the child can construct and take part with other equally bright children all of the time, even in the lunchroom.

In South Orange, you have a different philosophy imposed upon the circumstances that the school system is going through right now, part of which is emphasis on catch-up. They're succeeding, the question is how fast.

When asked if it was in Danielle's best interest to move to the Madison Middle School following fifth grade, Dr. McMahon responded:

I wouldn't say that's in her best interest. I would say that the Court has to make a decision about what to do next. I, as you know, lean toward Madison as the ideal.

Later he said that:

This child, as I said, will do well no matter where she is. The question is where will that be.

Dr. Thomas Schreiber, a child psychologist, testified for plaintiff and recommended that Danielle remain in the South Orange school system. Unlike Dr. McMahon, he asked Danielle whether she had a preference as to which school she wanted to attend, and she said that she wished to remain in the South Orange school but that she also had friends and activities in Madison. Danielle also told him that she enjoyed the integrated nature of the South Orange school and thought Madison a "lilly white district."

Dr. Schreiber opined that it would not be in Danielle's best interests for her to change schools at this time because,

> She's very comfortable and doing very well in the program which she attends and has—has her friendships, knows the school, enjoys being there, and that changing would be a disruption and a loss for her. It would introduce new anxieties, new relationships to build and I think it would be an unnecessary disturbance for her at this point.

As for changing school districts in the future, Dr. Schreiber reiterated his view to maintain the status quo because in his opinion Danielle would feel a loss from changing schools as well as a loss of community since her life would revolve more around Madison rather than South Orange.

On cross-examination, Dr. Schreiber was confronted with the 1996 New Jersey School Report Card for the two school systems and the result of state Early Warning Tests given to eighth grade students. Both showed differences favoring the Madison school system. In 1996, Madison spent $10,074 in expenditures per pupil as compared to $8,561 in South Orange. Moreover, Dr. Schreiber also conceded that assuming high academic brightness for Danielle, her learning style might not be as compatible as in a school system whose main philosophy was to raise test scores of all students. Nonetheless, he concluded that maintenance of the status quo was in Danielle's best interest.

> I think that in terms of Danielle personally, I think that she has the qualities which would help her excel just about anywhere, and I think that the more it's clear that either school, especially the South Orange schools, can provide stimulating, creative, exciting experiences for her as she gets older, that that would be—that she would do well there and would have a good education.

In addition to the testimony received from the parties and an interview with Danielle's sister, Christine, the trial judge also considered his interviews with Danielle on two separate occasions. In the first interview she declined to state a preference, saying only that she liked the Jefferson Elementary School and did not know anything about the Madison schools. The trial judge found that Danielle seemed troubled in the second interview, that she "stiffened" when the subject of school comparisons was addressed and then whispered, "South Orange" to the judge.

In addition to the testimony and the interviews, the trial judge also considered the 1996 New Jersey School Report Card for the South Orange Middle School and Madison Middle School as well as the 1995–1996 Early Warning Test for eighth grade and materials indicating educational and extracurricular activities of each school district.

Noting that Danielle tested in the top one percent nationally for her age, the trial judge found that "[t]here is no question that she needs the challenge and motivation from teachers, other students and from school programs that will help her meet that challenge and motivation." Rejecting cultural diversity as a factor by noting that both communities are culturally diverse, the trial judge found that the Madison school system to be academically superior.

The superiority with the Madison Middle School is evident from the New Jersey State report card issued from the State Board of Education. It is evident that the school district have different have different educational problems and resolutions that each must take. Students from South Orange are tested for weaknesses two times a year with teaching directed towards strengthening those students' weaknesses. South Orange divides its students in half with each half subdivided into the brightest, middle and the lowest. This division may or may not affect a student like Danielle being the brightest, but it will divide into groups which could affect Danielle academically and socially.

Madison has an academic program in which there are homogeneous groupings allowing the brightest students to work together academically in extracurricular programs and on their own using the academic projects available and technology available. However, both Dr. McMahon and Dr. Schreiber agree that Danielle should not be relocated until after she concludes the fifth grade at Jefferson. Danielle is going into the fourth grade.

\* \* \*

Danielle will remain in Jefferson School in South Orange until she completes the fifth grade. Danielle shall be enrolled in Madison School from the sixth grade through the 12th. The Court finds that Danielle's comfort level has—school and friends and teachers required to find and that it is in her best interests to remain in Jefferson at this time. The time will enable Danielle to prepare mentally, psychologically and emotionally to advance to a school district that the Court finds to be far superior academically and socially to afford her the best education while continuing her time with both her parents.

Danielle's father's residence shall be designated her primary residence for the sole purpose of declaring the resident to enroll in the South Orange Maplewood district until she completes the fifth grade at Jefferson School. On completion at

Jefferson in South Orange Danielle's mother's residence shall be designated her primary residence for her enrollment in the Madison school district.

We concur with the conclusion of the hearing judge supported by the testimony of both expert witnesses that Danielle is to continue to attend school in the South Orange school system through the fifth grade. However, we conclude that the trial judge abused his discretion and reverse that portion of the order directing that Danielle be enrolled in the Madison school system from the sixth through the twelfth grade.

We underscore that the parties have expressed their desire to continue their joint custody and time sharing arrangement for Danielle despite ample evidence of an inability to communicate and resolve upon an issue as significant as their child's education. Even with an arrangement that gives an option as to public education in either of two school districts, they cannot agree despite the assistance of a professional child care mediator. As noted by Justice Clifford in the seminal case of *Beck v. Beck,* 86 *N.J.* 480, 499, 432 *A.*2d 63 (1981), judicial enforcement of a joint custody agreement is "a thorny problem." Since all indications are that Danielle is both educationally and emotionally thriving, we find no basis to upset the continuation of the joint custodial arrangement. *See Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997); *Hoefers v. Jones,* 288 *N.J.Super.* 590, 672 *A.*2d 1299 (Ch.Div.1994), *aff'd* 288 *N.J.Super.* 478, 672 *A.*2d 1177 (App. Div.1996).

There are few reported cases of judicial relocation of a child's school from competing school districts. In *Asch v. Asch,* 164 *N.J.Super.* 499, 397 *A.*2d 352 (App.Div.1978), the father appealed the denial of his post-judgment motion to compel his former wife to enroll their daughter in a public school or a private, non-sectarian school at his expense rather than in a Catholic parochial school selected by his wife. Even though the child and her father were both Jewish and the mother had converted to Judaism, the motion judge approved the parochial school placement on the condition that the child not be exposed to formal religious instruc-

tion. We remanded the matter for further hearing including evidence comparing education opportunities at the competing schools and proofs of any other advantages or disadvantages to the daughter, emphasizing that the best interests of the child was the proper standard for decision.

> [I]t is axiomatic that the court should seek to advance the best interests of the child where her parents are unable to agree on the course to be followed. This goal gives us little guidance, however, in a case such as this where a wide variety of factors and interests must be considered.... [C]ourts should seek to minimize, if possible, conflicting pressures placed upon a child and to give effect to the reasonable agreement and expectations of the parents concerning the child's religious upbringing before their marital relationship foundered, subject to the predominant objective of serving the child's welfare comprehensively.
>
> [*Id.* at 505, 397 A.2d 352. *See also, Novak v. Novak,* 446 N.W.2d 422, 424–25 (Minn.App.1989) (holding that where joint custodians disagree on choice of school, the issue must be decided consistent with the child's best interests).]

■ Our careful review of the record leads us to conclude that there is an absence of proof to suggest that Danielle's best interests are not being served in the South Orange school district. Both experts agreed that she is thriving there, and there is every expectation that she will continue to excel educationally. While we defer to findings of the hearing judge which are supported by "adequate, substantial and credible evidence," *Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 N.J. 474, 484, 323 A.2d 495 (1974), we determine that the trial judge overstated the opinion of defendant's expert. The most that Dr. McMahon said favoring the court's holding was that he "leaned" toward Madison. He stated several times that the school in both districts was very good. Moreover, any "catch-up" that occurs in the South Orange district does not effect Danielle because she is not grouped with children in need of "catch-up." Dr. McMahon said that from the standpoint of gifted and talented education interests both school districts were superior at both grade school and middle school levels.

In finding that the Madison district was academically superior, the trial judge referred to his recollection of the testimony of Dr. McMahon, stating that,

> Dr. McMahon's testimony of June 5th provided reasons why he concluded that the Madison schools were better of the two districts comparing Madison with South

Orange school district. Dr. McMahon opined that Madison had better teachers and better, brighter students ...

Our review of the record conflicts with these findings. At no point in his testimony did Dr. McMahon say that Madison had better teachers, and his comments comparing the students was that "the percentage of bright kids in Madison at that particular school is greater, in my opinion, than it is at the middle school in South Orange." More importantly, at no point did Dr. McMahon state that a transfer to the Madison school district was in Danielle's best interest.

In reaching his conclusion, the trial judge also relied in significant part on the School Report Cards and results of Early Warning Tests for 1996. We question the wisdom of a Family Part judge engaging in a comparative evaluation of public school districts based on such data in the midst of an ongoing endeavor to equalize educational opportunities in this State. Moreover, the Early Warning Tests data related the general performance of school systems measured by tests administered to children in the eighth grade at a time when Danielle was in the third grade. There was a marked lack of testimony interpreting the tests and applying them to the issue of the best interest of Danielle.

In the context of the best interests of a child, any evaluation of a school district is inherently subjective. Just as a student cannot be summed up by IQ, verbal skills or mathematical aptitude, a school is more than its teacher-student ratio or State ranking. The age of its buildings, the number of computers or books in its library and the size of its gymnasium are not determinative of the best interest of an individual child during his or her school years. Equally, if not more important, are peer relationships, the continuity of friends and an emotional attachment to school and community that will hopefully stimulate intelligence and growth to expand opportunity.

The record indicates that Danielle is happy and performing well in her present school surroundings, and the expert testimony projects that she will continue to thrive and advance. We see no reason to alter course at present.

Furthermore, we find no evidential support for the trial judge's conclusion that it is in Danielle's best interests to designate Danielle's high school at a time when she is just beginning middle school. It is sheer speculation to opine as to her emotional and educational development that far in the future just as it is folly to predict the future cooperation of her parents on these matters. Dr. McMahon testified that any attempt to divine the best high school for this child at this point was "ludicrous." We agree.

Affirmed in part. Reversed in part.