**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0427-19

TRAVIS G. WALTSAK,

     Plaintiff-Appellant,

v.

JACQUELINE S. WALTSAK,

     Defendant-Respondent.

_____

Argued March 17, 2021 – Decided July 20, 2021

Before Judges Accurso, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-1637-17.

Bonnie C. Frost argued the cause for appellant (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost, of counsel and on the brief; Matheu D. Nunn, on the brief).

Peter A. Ouda argued the cause for respondent.

PER CURIAM

In this post-judgment matrimonial matter, plaintiff Travis G. Waltsak appeals from a Family Part order denying his motion for an order permitting A.W., one of two sons he shares with defendant Jacqueline S. Waltsak, to attend one of four identified public elementary schools, and granting defendant's cross-motion for an order permitting A.W. to attend Ambassador Christian Academy (ACA), a private school in Wall Township. Based on our review of the record, we are convinced there is sufficient, credible evidence supporting the court's determination that it is in A.W.'s best interests to attend ACA. We therefore affirm.

I.

Plaintiff and defendant married in 2007 and divorced in 2018. They share joint legal and physical custody of their two children: seven-year-old A.W. and five-year-old J.W. On October 15, 2018, the parties entered into a Custody and Parenting Time Agreement (CPTA) which, in relevant part, states:

> 10. RELIGIOUS COMMITMENT:
> a. [Plaintiff] and [defendant] agree and are committed to a continued Christian religious upbringing for [A.W.] and [J.W.] They pledge to prioritize religious church worship on a weekly basis, attending services at their individual church of choice, which shall be an Evangelical/Bible-based church, on their parenting time. Each parent will bring the boys to church service on their weekend, at their individual Christian place of worship.

A-0427-19

11. EDUCATION:
a. [Plaintiff] and [defendant] are mutually committed to the highest standards of quality education that their children will experience as they mature through childhood and adolescence. The parties shall consider all available options for school including private school, public school and a public school outside of their district (which is Wall Township). The parties shall attempt to reach agreement on the selection of a school and the allocation of responsibility for the costs, if any, of school. If they are unable to agree by March 1, 2019, they shall attend mediation and shall share the costs of mediation equally. If mediation is unsuccessful after two sessions, either party may file an application with the [c]ourt.

During their divorce proceedings, the parties discussed schooling options for the children. They considered ACA, which, at the time of the divorce, was located in Toms River, approximately thirty to forty minutes away from their Wall Township residence. When the children were younger, they attended "mommy and me" classes at ACA. At that time, ACA was not associated with Grace Bible Church, an evangelical, Bible-based church the parties attended during their marriage and defendant continues to attend with the children. Plaintiff and defendant also considered other schools, including the public schools in West Belmar, Sea Girt, and Spring Lake Heights. While the parties tried to agree on an elementary school for A.W., plaintiff enrolled both children

A-0427-19

in preschool programs at the Goddard School in Wall. A.W. did well in the program and made friends.

By March 2019, plaintiff suggested that A.W. be enrolled in kindergarten in the public schools in Sea Girt, Spring Lake Heights, West Belmar, or Point Pleasant Beach. Defendant, however, wanted to enroll A.W. at ACA, which had relocated to Wall Township in buildings rented from Grace Bible Church.

The parties were unable to agree on the school A.W. should attend, and, in accordance with the CPTA, they attended two mediation sessions. When the mediation proved unsuccessful, plaintiff moved for an order permitting A.W. to attend any one of the public elementary schools in Point Pleasant Beach, West Belmar, Spring Lake Heights, or Sea Girt. Defendant cross-moved for an order permitting A.W. to attend ACA.

In a July 12, 2019 order, a Family Part judge scheduled a plenary hearing on the motions for August 2019. The judge was later reassigned to the Civil Division, and a second Family Part judge conducted the scheduled plenary hearing in August and entered the order from which plaintiff appeals.

Plaintiff was represented by counsel at the hearing and testified he objected to A.W. attending ACA because he felt he would not be able to fully-participate in A.W.'s academic life due to its association with Grace Bible

4

Church. Plaintiff explained that he and defendant met through the church, were married there, and, during the marriage, their "whole social circle and community" revolved around the church.

In October 2016, defendant discovered plaintiff was having an extramarital affair. Defendant subsequently advised one of the church's pastors and a close family friend about the affair, and the church required that plaintiff participate in a three-stage disciplinary process.

As explained by defendant, during the first stage, a church elder attempts to persuade the member undergoing discipline to conform his or her behavior to the church's teachings. During the second stage, multiple elders or pastors attempt to convince the member to behave a certain way. During the third stage, a pastor informs the other church members about the non-conforming behavior, and the individual is removed as a member of the church's congregation.

Plaintiff described his experience during the disciplinary stages. During the first stage, a pastor pressured him to reconcile with defendant. During the second stage, church elders and pastors contacted him and attempted to convince him to reconcile with defendant. Plaintiff testified he did not want to reconcile, and he left the church and asked that he not be contacted.

A-0427-19

Plaintiff testified he subsequently received an email, notifying him that the third stage of discipline would be imposed because he had removed himself from the church and refused to reconcile with defendant. Plaintiff testified that he believed the third stage occurred and that the entire congregation was notified plaintiff and defendant separated.

Defendant, who appeared as a self-represented litigant, testified she was present when a pastor made the stage three disciplinary announcement at the church about plaintiff and defendant. She stated the announcement was made in front of approximately 200 church members after a church service. Defendant testified the pastor advised the members plaintiff had been unfaithful, defendant had admitted her part in the separation as well, and the parties' marital relationship was ending. Defendant stated the announcement lasted approximately five minutes and the pastor encouraged members who knew plaintiff to reach out to him and ask him to remain with the church and in the marital home.

Plaintiff explained that he has not been back to the church since it imposed the third stage of discipline and he has not had contact with any of the church members.

6

Plaintiff testified he did not "feel comfortable" with his children attending ACA because of his experience undergoing the three stages of discipline at the church and because he would come in contact with Grace Bible Church members whose children also attend the school. Plaintiff also testified he had "concerns" about sending his children to ACA because it has a "Bible-based curriculum." Plaintiff acknowledged, however, the students at ACA are not limited to children who are members of Grace Bible Church.

Defendant testified ACA's location in close proximity to the church may cause some discomfort for plaintiff, but she asserted it was in A.W.'s best interests to attend the school. Defendant explained she had wanted to send her children to ACA for a while, and she hoped to send them there because it is a Christian school that would offer her children an excellent education. She testified she was also inclined to send the children to ACA because plaintiff did not attend church with the children on a regular basis, and she believed ACA would ensure the children received a Christian upbringing. Defendant noted another benefit of ACA is that it is only two miles away from the Goddard School, where J.W. attends preschool.

Defendant testified she would pay the tuition for A.W.'s attendance at ACA. Defendant also testified her second choice was the Spring Lake Heights

7

school, but only if she did not have to pay tuition for it. Defendant's third choice was the school in West Belmar.

Plaintiff presented statistical information concerning the Point Pleasant Beach, West Belmar, Spring Lake Heights, and Sea Girt schools that he believed A.W. should attend. The source of plaintiff's information for the public schools is niche.com, a website that rates public schools based on statistics pertaining to the schools' test scores, student-to-teacher ratios, and other, similar information.

According to the statistical information presented from niche.com, all four public schools have academic and overall ratings in the "A" range, the student-to-teacher ratios are similar—with either eight-to-one or ten-to-one student-to-teacher ratios—and three of the schools offer sports. Two of the schools—Spring Lake Heights and Sea Girt—require that out-of-town students pay tuition. The schools' diversity ratings differ the most, with West Belmar receiving an "A minus" grade and Sea Girt receiving a "C" grade. Although niche.com includes some information about ACA, plaintiff testified the website did not rank ACA because it does not rank private schools.

Plaintiff also provided the court with school rankings from the website greatschools.org, which, like niche.com, compiles school statistics. Plaintiff testified niche.com and greatschools.org similarly rank the schools in Point

Pleasant Beach, West Belmar, Spring Lake Heights, and Sea Girt. Plaintiff further testified the schools in those municipalities are in close proximity to the parties' residences.[1]

Plaintiff also provided the court with four parent reviews of ACA that are posted on the greatschools.org website. Three of them are negative, and one review is more positive. Plaintiff admitted that greatschools.org had other positive reviews of ACA on its website, but he did not provide them to the court. Plaintiff also admitted he did not research any websites or other sources that rank private schools. Plaintiff further testified he did not object to the children being raised in the Christian faith, but he objected to the children attending ACA because of its association with Grace Bible Church.

Defendant testified the reviews of ACA that plaintiff presented are "not an accurate depiction of what the school offers." She noted the negative reviews plaintiff provided are several years old, and they did not criticize the education provided by the school but instead addressed issues related to the school's fundraising activities, the prior headmaster of the school, and the school's facilities prior to its relocation to Wall Township. Defendant also stated only

---

[1] Plaintiff testified he was in the process of moving to Point Pleasant, but the schools are close in proximity to his current West Belmar residence and future Point Pleasant residence.

A-0427-19

three of the forty-three reviews of ACA on greatschools.org give ACA a rating of less than four stars. The other reviews on greatschools.org, which plaintiff provided to the court, include positive comments about the education, teachers, and community at ACA.

Plaintiff called Nancy Mercadante, ACA's current headmaster, to testify. Mercadante explained that ACA leases the school building and part of the gym building from Grace Bible Church, but ACA's school facility is separate from the church. Mercadante testified ACA has an enrollment of 123 students in preschool through twelfth grade. She explained two teachers are members of Grace Bible Church, and approximately fifteen percent of the students attend the church. Mercadante testifed ACA has an open enrollment, meaning children need not be affiliated with Grace Bible Church to attend.

Mercadante testified ACA has a classical education curriculum, but the school also teaches from a Biblical worldview. She said most of the school's demographic is Caucasian, but there are also Hispanic, African-American, and biracial students. Mercadante testified most of ACA's students are Christian, and some of the students are not. She also explained that the kindergarteners, first-graders, and third-graders all scored higher than the national average in

10

A-0427-19

every subject area on a standardized test. Mercadante also stated college enrollment after graduation from ACA is nearly one hundred percent.

Mercadante testified the school has students whose parents are separated or divorced, and parents can set up their own logins, easily access all communications, including weekly updates, and arrange separate teacher conferences. Mercadante denied having any knowledge pertaining to the parties' divorce or any disciplinary actions that occurred at Grace Bible Church. She further denied anyone from the church advised her not to communicate with plaintiff.

Mercadante reviewed the information plaintiff presented concerning ACA and noted several inaccuracies. For example, she explained information from niche.com inaccurately reflected the student population consisted of ninety-six percent males, but the student population was actually evenly divided between males and females. She also noted the niche.com materials showed ACA offered kindergarten through eighth grade, but ACA also included a high school. Mercadante further explained ACA's teachers were certified, and many had dual certifications. She testified that Grace Bible Church has nothing to do with the operation of ACA.

A-0427-19

On August 20, 2019, the court entered an order permitting A.W. to attend ACA. In a decision issued from the bench, the court held that while A.W. would do well in either ACA or the public schools, ACA was in the child's best interests. The court considered: the best interests of A.W.; the religious preferences of the parents at the time the child was born; the language in the CPTA—specifically the parties' commitment to raise their children in the Christian faith and to consider all available school options; A.W.'s peer relationships; the advantages and disadvantages of the schools presented; the distances of the schools from each of the parties' homes; tuition costs; and the ability of both parents to be actively involved in the child's education.

The court explained that since the parties have joint legal and physical custody, deference was not given to either party's school choice. Although no expert testimony concerning the merits of the respective schools was presented, the court found that all the schools were "excellent," but the reviews and some of the information plaintiff produced concerning ACA were misleading. The court noted: (1) there were positive reviews of ACA; (2) the school was not predominately male, as supported by Mercadante's credible testimony; (3) the enrollment numbers at ACA were higher than plaintiff stated; and (4) ACA was not equivalent to homeschooling, as characterized by plaintiff. The court also

A-0427-19

found ACA had a strong academic foundation based on the test scores Mercadante provided.

Additionally, the court found ACA was not affiliated with Grace Bible Church. The court stated ACA's relationship with the church was a contractual lease and that only a few members of the faculty, board members, and student population were members of the church. The court noted A.W. had established peer relationships at ACA, and the school was now located in the parties' school district.

Although it noted the trauma plaintiff claimed he faced during his discipline at the church and acknowledged his feelings about the experience, the court found the evidence, including Mercadante's testimony, did not support a finding plaintiff would be excluded or shunned at ACA. Further, the court noted the parties' preference for a Christian upbringing in the CPTA and that the parties intended and agreed to raise their children in the Christian faith. Lastly, the court held defendant would be responsible for all tuition costs in accordance with her agreement to do so.

After considering the totality of the circumstances, the court determined it is in A.W.'s best interests to attend ACA at defendant's expense, and the court entered an order denying plaintiff's motion for an order requiring that A.W.

A-0427-19

attend one of the four public schools plaintiff proposed, and granting defendant's cross-motion for an order permitting A.W. to attend ACA.

Following plaintiff's appeal from the order, the court issued a written amplification of the reasons for its decision as permitted by Rule 2:5-1(b). The written amplification is signed by the judge who originally scheduled the motions for a plenary hearing and by the judge who conducted the plenary hearing, rendered the bench opinion following the hearing, and signed the order from which the appeal was taken.

In its Rule 2:5-1(b) amplification, the court echoed its oral decision and provided additional reasoning for its order. The court found ACA provided a good education in a Christian setting. The court rejected plaintiff's claim he would be ostracized at ACA, and it accepted as credible Mercadante's testimony that ACA had many students with divorced parents, she had not been made aware of what transpired between the church and plaintiff, and both parents could be equally involved in their child's school life—including having separate login access and an equal level of communication with the school.

The court further determined ACA had six advantages over the public schools suggested by plaintiff: (1) ACA was located in the same town where the parties resided; (2) ACA had a low student-to-teacher ratio; (3) students at ACA

14

tested above average on standardized testing; (4) ACA had a new facility; (5) ACA adhered to a classical education system; and (6) A.W. had developed peer relationships at ACA.

The court addressed plaintiff's argument that A.W. may suffer from developmental disabilities, which plaintiff believed would be better addressed by public school resources. The court found plaintiff offered no evidence A.W. has developmental disabilities and that plaintiff had conceded the child had no special needs. Further, the court noted plaintiff had produced a report from A.W.'s preschool stating the child was doing well and had no issues.

The court also briefly addressed the issues raised on appeal as outlined in plaintiff's appellate case information statement. The court rejected plaintiff's assertion that it misapplied the law by ignoring the plain language of the CPTA, explaining it reviewed the agreement's religion and school provisions, it did not give greater deference to ACA, and it looked at all available school options and weighed all appropriate factors in rendering its decision.

The court also rejected plaintiff's claim that it misapplied the law by giving defendant greater deference as if she were the parent of primary residence. The court explained it did not give deference to defendant and that

custody was not a determinative factor because the parties equally shared legal and physical custody.

The court further rejected plaintiff's argument that it misapplied the law by finding the parties would have sent their child to a Christian school if they had remained married. The court found plaintiff's argument was contradicted by the CPTA's terms and plaintiff's testimony that he has maintained his commitment to raise A.W. in the Christian faith.

The court also noted that plaintiff's claim it failed to consider the CPTA's plain language by permitting A.W. to attend ACA in Toms River, which is outside of the parties' school district, ignores the undisputed fact that ACA relocated in 2019 to Wall Township, where both parties resided. The court also detailed the procedural history of the case, noted neither party sought discovery, and found plaintiff's assertion the court failed to permit pretrial discovery to be without merit.

Last, the court again detailed its credibility findings, noting it found defendant more credible than plaintiff because plaintiff deliberately provided misleading and incomplete information about ACA, while defendant was "well-prepared and knowledgeable about the subject matters on which she testified," and she testified in a calm and even-toned manner. The court also found

16

Mercadante credible because she testified in a calm and intelligent manner, did not express any bias towards either party, did not evade questions, and provided clear answers to the questions posed. The court reaffirmed its decision it is in A.W.'s best interests to attend ACA.

II.

Plaintiff argues we should not consider or rely on the court's Rule 2:5-1(b) amplification because it was signed by two judges; it was used to rebut plaintiff's arguments on appeal; and it refers to and relies on certifications not admitted in evidence at the plenary hearing.

"Rule 2:5-1(b) . . . permits a judge, officer, or agency to file an amplification of a prior decision if it is appealed . . . ." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 383 (2013). The Rule "anticipates" and "expressly permits" a judge, officer, or agency to file an amplification after a party has filed an appeal. Id. at 390. The Rule does not prevent a judge, officer, or agency from filing an amplification if it has already issued an opinion or memorandum. See R. 2:5-1(b) (permitting a "trial judge, agency or officer" to file "an amplification of a prior statement, opinion or memorandum made either in writing or orally"). The Rule also does not prohibit a judge, officer, or agency from addressing issues a party raises—or might

17

raise—on appeal in the amplification. See, e.g., Scheeler v. Atl. Cnty. Mun. Joint Ins. Fund, 454 N.J. Super. 621, 625 n.1 (App. Div. 2018) (affirming an order based on the trial court's Rule 2:5-1(b) amplification that "thoroughly and correctly addressed" the legal challenges to the order raised on appeal).

We reject plaintiff's claim we should not consider the amplification because it was signed by two judges. We agree the signature of the judge who scheduled the plenary hearing was unnecessary because that judge did not hear the evidence upon which the judge who conducted the hearing based her decision and order. What is important, however, is that the judge who conducted the plenary hearing signed the Rule 2:5-1(b) amplification. That judge was entitled under the Rule to provide an amplification of her decision, and her signature confirms the findings in the amplification were made as additional support for the decision she rendered from the bench. In addition, and contrary to plaintiff's contention, that the court's Rule 2:5-1(b) amplification directly addresses arguments plaintiff raises on appeal provides no reason to disregard the court's amplification of the reasons supporting its entry of the order.

Plaintiff's remaining argument concerning the amplification—that we should not consider it because the court considered certifications not entered into evidence at the plenary hearing—is also unpersuasive. To be sure, a trial

court cannot properly find facts based on evidence that was not introduced at trial, and plaintiff correctly argues the court, in its amplification, refers to certifications that were not admitted in evidence during the plenary hearing.

The court's references to the certifications do not require a reversal, however, because there was evidence introduced at trial that independently supports the court's findings of fact for which the court erroneously cited the certifications. For example, the court erroneously cited plaintiff's certification for the proposition that plaintiff stated ACA is like home schooling. However, plaintiff likened ACA to home schooling not only in his certification, but also during his testimony.[2] The court also cited to plaintiff's and defendant's certifications to support its findings concerning Grace Bible Church's imposition of discipline against plaintiff, but during the plenary hearing each party provided extensive testimony concerning the disciplinary process. Similarly, the court cited to defendant's certification describing programs and facilities available at ACA, but both defendant and Mercadante testified at the plenary hearing concerning ACA's facilities, programs, and educational standards. Plaintiff also argues the court erred by citing his certification as the source of a quote from

---

[2] Plaintiff testified at trial that the classical Christian education offered at ACA is "similar" to home schooling, and that "a lot of home school programs use a classical model."

A-0427-19

the Bible, but the same Bible verse quoted in the amplification is included in an exhibit that was introduced at trial, and the court's decision is not in any manner based on the quoted verse.

In sum, the court's erroneous citation to the certifications in the amplification referenced information that was merely cumulative to evidence that was admitted during the plenary hearing. We therefore are not persuaded the court's citation to the certifications, as reasons additional to those first properly set forth in the court's bench opinion, was clearly capable of producing an unjust result requiring reversal of the court's order. R. 2:10-2.

Plaintiff also contends the amplification mischaracterizes his testimony by finding he argued "without any support whatsoever" that A.W. suffered from developmental disabilities and that the public schools would be better equipped to address those disabilities. Plaintiff actually testified A.W. had a hard time focusing, may have an attention disorder in the future, and that A.W. was "struggling and . . . having a hard time adapting" to the situation created by the parties' divorce. Plaintiff also testified that, to his knowledge, ACA did not have a "program . . . to address the special needs of the children," that public schools "all have counselors and things like that to support" the students, and that it was "part of [his] quest to make sure that the resources are available to [A.W.] if an

issue should arise." While it is correct plaintiff did not directly testify A.W. suffered from a developmental disability, plaintiff stated A.W. was struggling at present, and testified he might suffer from one in the future, for the admitted purpose of fulfilling his quest to convince the court that the resources required to address the child's present issues and possible disorders were available only at the public schools.

In our view, the court's inaccurate finding plaintiff testified A.W. suffered from a developmental disability is of no moment. The court relied on the purported testimony to support its finding that plaintiff claimed, without any basis in the evidence, that A.W. required counseling and other services that ACA could not provide. Despite the court's inaccurate reference to purported testimony about a developmental disability, the court's finding is nonetheless supported by plaintiff's testimony that A.W. may suffer from an attention disorder in the future that will require services plaintiff testified he did not believe ACA could provide. That is, the court's finding plaintiff sought to obtain approval for A.W. to public schools by claiming they could provide counseling services that were unavailable at ACA, while not supported by any testimony A.W. suffers from a developmental disability, is supported by plaintiff's testimony that such services may be required because A.W. may

21

develop an attention disorder in the future. And, as plaintiff explained, his suggestion such services may be required was part of his quest for approval for A.W. to attend the public schools plaintiff preferred.

Plaintiff also argues we should reverse the court's decision to permit A.W. to attend ACA because its factual findings are not supported by the record. Plaintiff contends the court made unsupportable credibility findings and gave improper weight to the evidence the parties presented.

Our scope of review of a family court's factfinding is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We will uphold the court's factual findings "when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility,'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare, 154 N.J. at 412), and we accord deference to the Family Part's factfinding "[b]ecause of the . . . court['s] special jurisdiction and expertise in family matters," Cesare, 154 N.J. at 413. We will not reverse the court's findings unless they "were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020) (quoting Rova Farms Resort,

Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).  However, we accord no deference to a trial court's legal conclusions and review them de novo.  Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

Where, as here, the parents share joint custody and are unable to agree on where to send their child to school, "[i]t is axiomatic that the court should seek to advance the best interests of the child."  Levine v. Levine, 322 N.J. Super. 558, 566 (App. Div. 1999) (quoting Asch v. Asch, 164 N.J. Super. 499, 505 (App. Div. 1978)).  "The 'best interests' of the child means, among other things: (1) the right of [the] children to be supported, nurtured, and educated in accord with the parents' collective income; and (2) requiring the parents to keep their promises and commitments consistent with their ability to do so."  D.G. v. K.S., 444 N.J. Super. 423, 439 (Ch. Div. 2015) (citing Hoefers v. Jones, 288 N.J. Super. 590, 604 (Ch. Div. 1994), aff'd o.b., 288 N.J. Super. 478 (App. Div. 1996)).

A determination of which school is in a child's best interests is "inherently subjective."  Levine, 322 N.J. Super. at 567.  Such a determination requires the court to not only consider a school's statistics and ranking, but also "peer relationships, the continuity of friends[,] and an emotional attachment to school and community that will hopefully stimulate intelligence and growth to expand

23

opportunity." Ibid. In balancing these factors, the court should also consider the religious preferences of the parents at the time the child was born. Asch, 164 N.J. Super. at 505.

Additionally, our courts have found that "[r]eligious and moral training" is "an important, positive growth experience in advancing a child's best interests." Hoefers, 288 N.J. Super. at 609. Thus, although "courts do not choose between religions," they will, subject to the child's best interests, "give effect to the legitimate expectations of each of the parents with respect to their child[]'s upbringing and the legitimate right of the child[] to understand [his or her] heritage." Feldman v. Feldman, 378 N.J. Super. 83, 93 (App. Div. 2005) (quoting McCown v. McCown, 277 N.J. Super. 213, 219 (App. Div. 1994)).

Here, plaintiff and defendant have an agreement that addresses their children's religious upbringing and education. Our state "favor[s] the use of consensual agreements to resolve marital controversies." J.B. v. W.B., 215 N.J. 305, 326 (2013) (quoting Konzelman v. Konzelman, 158 N.J. 185, 193 (1999)). Thus, a court should not "unnecessarily or lightly disturb[]" a marital agreement, Quinn v. Quinn, 225 N.J. 34, 44 (2016) (quoting Konzelman, 158 N.J. at 193-94), and it will not "rewrite or revise an agreement when the intent of the parties is clear," id. at 45.

24

The CPTA provides that the parties "agree and are committed to a continued Christian religious upbringing" for their children. The parties are also "mutually committed to the highest standards of quality education" for their children, and they agreed to "consider all available options for school including private school, public school and a public school outside of their district (which is Wall Township)." Because plaintiff and defendant could not agree on a school for A.W., the court considered all of the schooling options presented by the parties and considered the parties' commitment to raising their children Christian as one factor weighing in favor of permitting A.W. to go to ACA. See Asch, 164 N.J. Super. 505 (recognizing a parental agreement pertaining to a child's religious upbringing is one of many factors a court may consider when determining which school is in a child's best interests).

The court did not, however, merely consider ACA's religious nature in its determination that attending ACA would be in A.W.'s best interests. The court also considered and relied on many other facts based on the testimony of the parties, Mercadante's testimony, and the evidence. See generally Levine, 322 N.J. Super. at 567 (detailing factors to be considered in determining a child's best interests in attending one among numerous schools); Asch, 164 N.J. Super. at 505 (same). The court found ACA was conveniently located near the parties'

A-0427-19

residences and the Goddard School, where J.W. attends; the students at ACA performed above average on standardized tests; the student-to-teacher ratio is low; and the vast majority of reviews of ACA spoke positively about the education and atmosphere offered by the school.

The court also considered plaintiff's negative experience undergoing the three stages of discipline as it pertains to ACA, and his claim that his disciplinary history with Grace Bible Church would affect his ability to effectively function as a parent of a student at the school. The court acknowledged plaintiff's experience at the church but determined it would not prevent plaintiff from participating as A.W.'s parent at ACA. It found that although ACA leases its buildings from the church, the school is not affiliated with the church, and only approximately fifteen percent of the students at ACA attend the church. The court also found the church did not shun plaintiff; instead, plaintiff chose to disassociate himself from the church and its members. Finally, the court determined plaintiff's marital status and departure from the church would not affect his ability to participate in A.W.'s education at ACA because many parents whose children attend ACA are separated and thus are given different logins and receive all communications from the school, and

A-0427-19

Mercadante testified that plaintiff's affiliation—or lack thereof—with Grace Bible Church would not influence how ACA treated him.

Based on our review of the record, we are convinced the court's findings of fact are supported by sufficient evidence the court deemed credible, and its determination it is in A.W.'s best interests to attend ACA is supported by the court's findings of fact and application of the pertinent legal principles. Cf. Levine, 322 N.J. Super. at 566-68 (reversing in part after finding the child was thriving in her current school, and also determining there was no evidence supporting the court's holding that it was in the child's best interests to go to a particular high school when she had just started middle school).

Contrary to plaintiff's claims, the court did not ignore the terms of the CPTA, improperly shift the burden to plaintiff to prove that ACA was not in A.W.'s best interests, or base its determination on an erroneous assumption that defendant was the parent of primary residence. Those claims are contradicted by the record. The court recognized the parties' shared joint custody, and explained its determination therefore could not be based on custody and instead required an analysis of the other pertinent factors. As detailed in the court's oral opinion and written amplification, the court correctly considered the merits of all the schools proposed by the parties, the language in the CPTA, and all of the

27

factors pertinent to a best interests determination pertaining to the selection of a school.  See id. at 567.

We similarly find unavailing plaintiff's challenge to the court's credibility determinations.  As a reviewing court, "[w]e defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall, 222 N.J. at 428 (quoting Cesare, 154 N.J. at 412).  Although plaintiff offers various bases for his claim the court should have made different credibility determinations, we discern no basis to upset the court's detailed credibility findings, which are based on the evidence presented, the demeanor of the respective witnesses, plaintiff's decision to present only selective information concerning ACA, and the court's observations of each witness during the testimony presented.

In sum, we find the court's findings of fact, credibility determinations, and conclusion it is in A.W.'s best interests to attend ACA are amply supported by sufficient credible evidence.  The court considered the appropriate factors in determining A.W.'s best interests.  Plaintiff's mere dissatisfaction with the court's well-supported decision and claims the court should have interpreted the

evidence differently do not provide an appropriate basis to reverse the court's order. To the extent we have not expressly addressed any of plaintiff's arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION